Jesse **GLOVER**, Appellant/Cross–Appellee,

v.

**STATE** of Alaska, DEPARTMENT OF TRANSPORTATION, ALASKA MARINE HIGHWAY SYSTEM, Appellee/Cross–Appellant.

Nos. S–12220, S–12329.

Supreme Court of Alaska.

Jan. 18, 2008.

---

**11.** Op. at 1237.

James P. Jacobsen, Beard Stacey Trueb & Jacobsen, LLP, Anchorage, for Appellant/Cross–Appellee.

Susan D. Cox, Assistant Attorney General, and David W. Márquez, Attorney General, Juneau, for Appellee/Cross–Appellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

A state-employed seaman injured on the job presents a declaratory challenge to AS 09.50.250(5), a recently enacted provision rescinding the state's waiver of sovereign immunity from suits under the federal Jones Act and referring state employees exclusively to the state workers' compensation system. The employee argues that the statute violates the Alaska Constitution's waiver of sovereign immunity, is preempted by federal law, and violates his due process and equal protection rights. The superior court upheld the amended statute. We affirm because (1) the Alaska Constitution's waiver of sovereign immunity is not absolute, (2) the federal government's jurisprudence defers to state assertions of sovereign immunity, and (3) the statute survives due process and equal protection challenges.

## II. FACTS AND PROCEEDINGS

### A. Facts

The facts relevant to this declaratory challenge are undisputed. In 2003 the Alaska Legislature passed an amendment to AS

09.50.250 to revoke the state's waiver of sovereign immunity for suits by state-employed seamen.[1] The effect of this amendment was to require injured seamen previously entitled to sue the state under the federal Jones Act[2] to seek compensation for injury through the state workers' compensation system[3] instead. The amendment added a fifth type of exception to the state's general waiver of sovereign immunity. In relevant part AS 09.50.250 states:

A person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in a state court that has jurisdiction over the claim.... However, an action may not be brought if the claim

. . . .

(5) arises out of injury, illness, or death of a seaman that occurs or manifests itself during or in the course of, or arises out of, employment with the state; AS 23.30 provides the exclusive remedy for such a claim and no action may be brought against the state, its vessels, or its employees under the Jones Act (46 U.S.C. 688), in admiralty or under the general maritime law.

The bill was introduced into both the house and the senate at the request of then-governor Frank Murkowski. In a letter that accompanied the initial bill, the governor explained that the bill "would provide a uniform equitable remedy for work injuries of all state employees under a single compensable system. AMHS crew and a small number of other ship based personnel are the only state employees presently authorized to file a direct civil (negligence) action against their employer for on-the-job injury or illness."

On February 6, 2004, after the effective date of the statute, Jesse Glover was working for the Alaska Marine Highway System (AMHS) as a crew member on the M/V TUSTAMENA. The vessel was afloat on navigable waters off the coast of Alaska. As the ship approached Cordova, the car deck hatch was opened using a substitute motor. Glover was on the forecastle deck as the ship was approaching the dock and fell through the hatch. Glover suffered injuries in the fall that required surgery on his feet.

Glover claims (and the state denies) that his injuries—including head, spine, and foot injuries—were "a direct and proximate result of the carelessness and negligence of defendant and the unseaworthiness of the vessel." Glover stated in his October 2004 declaration that he was undergoing daily rehabilitation and anticipated needing additional surgery in the future.

### B. Proceedings

Glover's employer, pursuant to AS 09.50.250(5), handled Glover's injury under the workers' compensation system. Glover brought this case in the superior court, presenting a declaratory challenge to AS 09.50.250(5)'s revocation of the state's sovereign immunity waiver with respect to state-employed seamen. Glover challenges AS 09.50.250(5) on several grounds. First, Glover states that the statute violates article II, section 21 of the Alaska Constitution, which Glover contends is an unequivocal and self-executing complete waiver of state sovereign immunity. Second, Glover argues that the statute impermissibly violates the United States Constitution because it attempts to displace supreme federal law with a state remedy and because it discriminates against a federal cause of action. Third, Glover argues that the statute violates his rights under the Alaska Constitution, including his right to a jury trial, his due process right to access the courts, and his right to equal protection.

In December 2005 Superior Court Judge Patricia A. Collins issued a comprehensive order denying Glover's motion for declaratory judgment and granting the state's motion for declaratory and summary judgment. In January 2006 Judge Collins entered an order for final judgment. Glover appeals those determinations.

---

**1.** Ch. 30, § 1, SLA 2003.

**2.** 46 U.S.C. §§ 30104–05 (2006). This provision was located at 46 U.S.C.App. § 688 when the parties submitted briefing in this case. Section 688 was recodified on October 6, 2006, *see* Pub. Law 109–304, 120 Stat. 1501, and although minor changes were made to the text of the provision during the recodification, they do not impact our analysis in this case.

**3.** AS 23.30.001–.400.

The state moved for partial attorney's fees pursuant to Alaska Civil Rule 82(b)(2). Glover argued that he was a public interest litigant and therefore not subject to an attorney's fee award under Rule 82. Judge Collins found that Glover was not a public interest litigant because his action was "clearly motivated primarily by a private economic interest in damages even though other public policy questions ... are implicated." Judge Collins nonetheless found that "other equitable factors" justified a downward departure in the fee award and awarded the state only $1000 in attorney's fees. The state appeals the attorney's fee award. The two appeals have been consolidated.

## III. STANDARD OF REVIEW

■ Our review of the constitutional and statutory interpretation issues raised in this case is de novo.[4]

■ We review the superior court's award of attorney's fees under an abuse of discretion standard, and will disturb the award only if it is manifestly unreasonable.[5]

## IV. DISCUSSION

### A. Alaska Statute 09.50.250(5) Does Not Violate Article II, Section 21 of the Alaska Constitution.

Article II, section 21 of the Alaska Constitution states: "The legislature shall establish

procedures for suits against the State." The question before us is whether this section of the constitution operates as an *absolute waiver* of sovereign immunity—in which case the legislature has no statutory authority to reclaim immunity for specific types of claims—or, in the alternative, if the provision only waives *absolute immunity*—in which case the legislature may specify the circumstances under which the state's less-than-absolute sovereign immunity will apply. Glover advocates the former approach, the state the latter. Glover's first basis for challenging the constitutionality of AS 09.50.250(5) is that the constitutional provision is an absolute waiver of sovereign immunity.[6]

Glover's interpretation of the constitution is a major departure from the way the provision has been addressed in the past by both the legislature and this court. In 1962 the legislature first enacted AS 09.50.250, which both provided the statutory scheme for the implementation of article II, section 21 and included three exceptions to the state's general waiver of its sovereign immunity.[7] These exceptions and their later amendments have been enforced repeatedly by the Alaska courts.[8] Additionally, we addressed the specific issue of the state's immunity from Jones Act suits by employee seamen in *State, De-*

---

4. *Citizens Coalition for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 164 n. 3 (Alaska 1991).

5. *Alaska Placer Co. v. Lee*, 553 P.2d 54, 63 (Alaska 1976).

6. Glover does not adopt the terminology of "absolute waiver," preferring to cast the question as whether *the* waiver occurred in the constitution or in the statute. Nonetheless, Glover's position—that the legislature lacks authority to place limitations on the waiver—amounts to an adoption of the "absolute waiver" position.

7. Ch. 101, § 26.01, SLA 1962 (prohibiting actions based on (1) state employee exercising due care or discretion; (2) damages due to quarantine; (3) assault, battery, false imprisonment, false arrest, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights). The potential impact of this litigation on the other statutory exceptions to the waiver of sovereign immunity received no attention in Glover's briefing before this court and only limited attention in his briefing before the superior court. There, Glover contended that

the state's other claims of sovereign immunity might derive from other sources and thus might permissibly coexist with his interpretation of the constitutional provision. We decline to reach this issue.

8. *See, e.g., Angnabooguk v. State*, 26 P.3d 447, 453 (Alaska 2001) ("Under the Alaska Tort Claims Act, AS 09.50.250, the State is immune from certain types of tort claims."); *McCutcheon v. State*, 746 P.2d 461, 468 (Alaska 1987) ("[T]he state enjoys immunity from the suit under AS 09.50.250(3), which places libel actions among the express exceptions to the waiver of sovereign immunity."); *State v. Dupere*, 709 P.2d 493, 496 (Alaska 1985) (upholding procedural statutory restrictions on the right to sue the state under AS 09.50.250); *Freeman v. State*, 705 P.2d 918, 920 (Alaska 1985) ("State liability is the rule; immunity is the exception."); *Univ. of Alaska v. Nat'l Aircraft Leasing, Ltd.*, 536 P.2d 121, 122 (Alaska 1975) ("Within certain limitations, one is authorized by statute to sue the State of Alaska on a contract, quasi-contract or tort claim."); *Etheredge v. Bradley*, 480 P.2d 414, 416 n. 7 (Alaska

*partment of Public Safety v. Brown*[9] and indicated that the legislature could create a statutory exception to the waiver of sovereign immunity for seamen, but that without such an exception the state's general waiver of immunity allowed suit.[10]

Glover argues that in spite of this long history of state sovereign immunity, this case presents an issue of first impression for the court. Glover suggests that a careful investigation of the constitutional history of article II, section 21 leads to the conclusion that it was intended to be an absolute waiver of sovereign immunity. Glover approaches the constitutional history from three different angles: He argues: (1) that the debates from the Constitutional Convention show that the provision absolutely waived sovereign immunity, (2) that the self-executing provision of the constitution requires his interpretation, and (3) that the history surrounding the final language of the constitutional provision warrants his interpretation. He also argues that the legislative history of AS 09.50.250 supports his position. The state argues that interpretation of similar constitutional provisions in other states supports its interpretation of the constitution and argues that even if Glover were correct in his most narrow reading of the constitutional provision, AS 09.50.250(5) still passes constitutional muster because it provides a procedure for Glover to sue the state for his injuries. We address each of Glover's contentions in turn.

**1. The members of the constitutional convention did not intend to waive the state's sovereign immunity absolutely or without exception.**

■ The clause of the Alaska Constitution waiving sovereign immunity[11] was presented to the constitutional convention in draft form by the Legislative Branch Committee ("legislative committee") as part of the proposed article on the legislative branch.[12] On December 14, 1955, the legislative committee presented its first proposal of the legislative branch article. The provision regarding sovereign immunity stated:

> The legislature shall direct by law in what manner and in what court suits may be brought against the state or agencies thereof.[13]

This proposal was accompanied by the following commentary:

> Congress has by law permitted suits by aggrieved or injured citizens against the United States, and most states permit under various restrictions suits against municipalities and other local governments. It is no longer regarded as justice for the states to preserve absolute immunity against legal action for injuries its agents may commit.[14]

The state argues that this language is evidence that the committee intended to waive only *absolute immunity*, allowing "restrictions" on the suits that may be brought against the government.

According to the available records, the provision was debated specifically on the floor of the convention (rather than in committee) on only two occasions during the Constitutional Convention.[15] The first time

---

1971) ("The amendment to the statute was introduced by the Senate Judiciary Committee in response to questions raised by this court ... in order to specifically spell out exactly what claims could be brought against the state under [AS 09.50.250–.300]") (internal quotation omitted).

**9.** 794 P.2d 108 (Alaska 1990).

**10.** *Id.* at 111.

**11.** Initially the sovereign immunity clause was section 12 of the legislative article, though in the final constitution it became article 21.

**12.** 6 Proceedings of the Alaska Constitutional Convention (PACC) App. V at 29–38 (Dec. 14, 1955).

**13.** *Id.* at 32.

**14.** Alaska Constitutional Convention Legislative Branch Committee, Commentary on Proposed Article on Legislative Branch (Dec. 14, 1955) (Alaska State Archives: Constitutional Convention 310.05 at 5).

**15.** 7 PACC 4 (Index 1965). The main issues facing the legislative committee were "unicameralism versus bicameralism, age and residence requirements for legislators, length of legislative sessions, salaries, and legislative rules and organization." Victor Fischer, Alaska's Constitutional Convention, 84–85 (1975).

was on January 10, 1956.[16] At that time Judiciary Branch Committee chairman George McLaughlin moved to amend the proposal on sovereign immunity in order to make sure it would not conflict with the article on the judiciary.[17] McLaughlin's proposal borrowed language from Oregon's waiver of sovereign immunity to replace the proposed language which was, at that time, nearly identical to Arizona's waiver.[18] McLaughlin felt that Oregon's language was more appropriate for Alaska because of the resulting impact it had on the legislature's ability to create courts,[19] a topic not at issue here.

Steve McCutcheon, chairman of the legislative committee, spoke to reassure the convention regarding how this article interacted with the court system. McCutcheon stated it would only involve the legislature designating the particular level of court in which suits against the state would be brought, rather than requiring or allowing the creation of new courts, as McLaughlin feared.[20] In this context, McLaughlin asked if it was the intent of the committee to authorize suits against the state, and McCutcheon said yes.[21] McCutcheon elaborated:

> I feel that because the Committee intended one thing, I think that this group understands what the Committee intended, that our Committee has no objection if this particular amendment is the thing that makes it perfectly clear what was intended by our group. In other words, *the Legislative Committee felt that the state may be sued, period;* that the legislature shall indicate which level of court shall hear that suit against the state.[22]

Glover argues that this language from McCutcheon indicates a clear intent that the waiver be absolute. The context of the debate, however, reveals that McCutcheon was rejecting the suggestion that the provision allowed for the creation of new courts or in other ways interfered with the workings of the judiciary. Thus, McCutcheon's description of what the legislative committee intended was not within the framework of a debate between absolute immunity or partial immunity.

Later in the same debate, delegate George Sundborg[23] asked McLaughlin whether the amendment would allow suits by taxpayers who have no standing other than as taxpayers.[24] McLaughlin said that it would not allow those suits.[25] The matter was adjourned for the day for the purpose of allowing the members of the judiciary committee to study the issue.[26]

On January 11 the debate reopened for the second and last day of actual debate on the sovereign immunity provision. McLaughlin proposed two changes to the legislative committee's proposed language in order, again, to avoid conflicting with the judiciary article.[27] Delegate Ralph Rivers asked McLaughlin: "[Y]ou have said the legislature shall direct the manner in which suits may be brought against the state? Doesn't the legislature also decide what liabilities the state will assume or what actions, when the state will be sued as well as the manner?"[28]

McLaughlin responded:

> I leave that up—it was my understanding, Mr. Rivers, from the Committee that they wanted to direct that the sovereign state could be sued and that the legislature couldn't prevent it. *It is my understanding that they can place a limitation on the*

16. 3 PACC 1703–10 (Jan. 10, 1956).

17. *Id.* at 1703–04.

18. *Id.* at 1707–08.

19. *Id.*

20. *Id.* at 1704–05.

21. *Id.* at 1705.

22. *Id.* (emphasis added).

23. Sundborg was the Chairman of the Committee on Style and Drafting. FISCHER, *supra* note 15, at 267.

24. 3 PACC 1706 (Jan. 10, 1956).

25. *Id.*

26. *Id.* at 1710.

27. 3 PACC 1818–19 (Jan. 11, 1956).

28. *Id.* at 1818.

*liability.* I am not changing, I'm sure, the meaning, but I am removing an apparent or apparent at least to some, conflict with the judiciary article.[29]

In its briefing the state argues that the line "It is my understanding that they can place a limitation on the liability" reflects a less than absolute waiver of immunity. Glover argued in the superior court that this line was a slip of the tongue and placed a "[sic]" after the word "can" in his briefing before the court. In his reply brief before this court Glover advances a new interpretation, suggesting that the "they" referred to the legislative committee drafting the section, not to the legislature of the future.

Glover's discounting of McLaughlin's statement is supported by subsequent comments of one of the delegates:

Rivers: I was thinking that the way it is now written it leaves the state open to be sued at all times and I didn't know the body had arrived at the idea of letting the state be sued at all times.

McLaughlin: That was the intent as I understand it, of the Committee, who originally drafted this article.[30]

McLaughlin's proposed amendments, the subject of the debates, were not adopted, and the first enrolled version of the provision was functionally identical to the legislative committee's proposal.[31]

 The sum total of the constitutional convention discussion thus paints a muddled picture. As we have noted in the past, individual comments from delegates do not necessarily reflect constitutional intent.[32] We agree with Glover that some of the delegate comments support a reading of absolute waiver, particularly McLaughlin's characterization of what he (a non-committee member) believed the legislative committee intended. That characterization was not corrected by any committee members on the record. However, a reading of the full debate on this provision leaves us unconvinced that even the most absolutist characterizations of the provision ever represented even the speaker's view on state immunity. No comments express a justification for allowing all types of suit against the state at all times. Moreover, we give more credence to other elements of the constitutional record and less to the debate remarks.

The most carefully crafted explanation of article II, section 21 was the one that accompanied the official committee report, permitting "under various restrictions" suits against government.[33] That explanation supports the state's position that the constitution would waive absolute sovereign immunity and replace it with restricted sovereign immunity, as several other states had done.

We accept the state's view of the meaning of the provision. Glover's position is based on off-the-cuff remarks from two convention delegates spoken within the context of a debate on the role of the judiciary rather than a debate on the matters to which sovereign immunity would apply. Most importantly, for our analysis, no direct debate occurred on the subject of whether or not the legislature ought to be able to restrict the circumstances of the waiver.[34] Under the "dog that didn't bark" [35] canon of statutory construction, the

---

29. *Id.* at 1818–19 (emphasis added).

30. *Id.* at 1819.

31. Alaska Constitutional Convention Legislative Branch Committee, ·First Enrolled Copy of Proposed Article on Legislative Branch (Jan. 12, 1956) (Alaska State Archives: Constitutional Convention 410.02 at 4–5).

32. *See Matthews v. Quinton,* 362 P.2d 932, 944 (Alaska 1961) (noting that every delegate in the convention has his or her own reasons for voting and the debate may not reflect the reasons held by the majority).

33. *See* discussion of Commentary on Proposed Article on Legislative Branch, *supra*, at 1246.

34. As quoted above, the only discussion of whether or not the committee intended an absolute waiver was indirect, at best, asking if the legislative committee had intended to create various exceptions rather than speaking in favor or against such exceptions.

35. The name of this canon derives from a remark made by Sherlock Holmes in Sir Arthur Conan Doyle's short story "Silver Blaze." Holmes solved the case by recognizing the import of the fact that a dog in the stable had failed to bark when the criminal was in the stable, thereby concluding that the criminal was someone the dog knew. ARTHUR CONAN DOYLE, THE MEMOIRS OF SHERLOCK HOLMES 3 (Oxford Univ. Press 2000).

absence of greater discussion is a meaningful indication that the convention was *not* charting a radical course in the arena of state sovereignty.[36] We therefore conclude that the original language proposed by the committee and the subsequent plenary debates do not suggest that the delegates intended to create an absolute waiver of sovereign immunity.

### 2. The self-executing provision of the constitution does not require the interpretation that sovereign immunity was absolutely waived.

Glover argues that article XII, section 9 of the Alaska Constitution—"The provisions of this constitution shall be construed to be self-executing whenever possible"—requires that article II, section 21 be interpreted as an absolute waiver of sovereign immunity. We disagree. Because article II, section 21 contains a directive for legislative action, it is incapable of being self-executing. Moreover, Glover cites no case law for his proposition, and he fails to show that we have ever utilized article XII, section 9 to interpret the meaning of other constitutional provisions.

### 3. The differences between the final and preliminary language of the sovereign immunity waiver do not mask a substantive change.

Following January 11, 1956, the date of the last floor debate on the waiver provision, the convention voted to adopt the article and then sent it to the Committee on Style and Drafting.[37] On January 25 that committee presented a redraft of the legislative article to the convention. The first enrolled version (pre-style and drafting committee) read:

> The legislature shall direct by law in what manner suits may be brought against the state.[38]

The style and drafting committee's proposal and the final language of the provision read:

> The legislature shall establish procedures for suits against the state.[39]

Glover argues that the changes made in the style and drafting committee provide further support for his interpretation of the section by its omission of the words "by law" and use of the words "shall" and "procedures." The state argues that changes made in the style and drafting committee were by definition non-substantive and thus should not play any role in the court's analysis. Legislative history shows that no substantive importance should be attached to the changes made by the style and drafting committee in this case.

■ As a general rule, changes in meaning should not be derived from the edits of the style and drafting committee.[40] Delegate Edward Davis, a member of the committee, spoke to the plenary session to inform the convention that the committee attempted to preserve the substantive meaning of the provisions during its editing process, and that the delegates should assume that the style and drafting committee did so unless specifically noted.[41] Kimbrough Owen, an adviser to the committee, spoke to the full session about the work of the committee.[42] Owen explained that the committee had attempted

---

**36.** *Church of Scientology of Cal. v. I.R.S.*, 484 U.S. 9, 17–18, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987) ("[W]e think this is a case where common sense suggests, by analogy to Sir Arthur Conan Doyle's 'dog that didn't bark,' that an amendment having the effect petitioner ascribes to it would have been differently described by its sponsor, and not nearly as readily accepted by the floor manager of the bill."); *see also Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 63, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004) (invoking "dog that didn't bark" canon to conclude that amendment to statute did not mean to alter additional section of statute).

**37.** 3 PACC 1827 (Jan. 11, 1956).

**38.** 6 PACC app. V at 32 (Dec. 14, 1955); Alaska Constitutional Convention Legislative Branch Committee, First Enrolled Copy of Proposed Article on Legislative Branch (Jan. 12, 1956) (Alaska State Archives: Constitutional Convention 410.02 at 4–5).

**39.** 6 PACC app. VI at 12 (Feb. 5, 1956).

**40.** *See* 1 Journal of the Alaska Constitutional Convention, Nov. 10, 1955, at 6, Rule 16(c) (stating that the style and drafting committee "shall have no authority to change the sense or purpose of any proposal referred to it").

**41.** 4 PACC 2819 (Jan. 21, 1956).

**42.** 4 PACC 3047–49 (Jan. 25, 1956).

to "take the expressions that are commonly used throughout the constitution and see that they are used uniformly so that the intent will not be misunderstood." [43] When the committee presented its revised version of the legislative branch article, committee chairman Sundborg stated, "I think, definitely, we have made no change in substance." [44]

Against this backdrop, we address each change upon which Glover relies.

#### i. Deletion of "by law"

The phrase "by law" was included in the first draft of the sovereign immunity waiver but not the final. Glover references the "donnybrook" that occurred at the convention over the use of this phrase in the constitution. However, the convention debate centered around the power of the initiative and is inapposite to the question at hand. Delegates were concerned about whether the power of the initiative would be restricted to instances where the constitution said "by law" rather than "by the legislature." [45] In the end the convention adopted a constitutional provision instructing the interpreters of the constitution not to draw any conclusions from the distinction between "by law" and "by the legislature." [46]

Glover asserts that "by law" connoted lawmaking authority which the convention decided not to apply to the sovereign immunity waiver because it was unnecessary. However, Glover points to nothing in the debate on "by law" versus "by the legislature" discussing the import of removing the phrase from the provision altogether. We therefore decline to draw any meaning from that deletion.

#### ii. Insertion of "procedures for suits"

The language changed between drafts from "in what manner and in what courts suits may be brought" to "procedures for suits." Glover argues this change is significant because the term "procedures" should be read consistently throughout the constitution to have a non-substantive meaning. If "procedures" has only a non-substantive meaning, Glover argues, then the legislature does not have the power to decide on various exceptions to the sovereign immunity waiver. For support, Glover cites to Owen's speech on the attempt to consistently apply words. The state emphasizes that the change from "in what manner" to "procedures" was the result of "superficial edits" by the style and drafting committee, which repeatedly declared it had made no changes in meaning. As a result, the state analyzes the initial language of "in what manner" and notes that other states have concluded that the phrase "in what manner" allows the legislature to determine in what circumstances the state may be sued.[47]

The state also argues that "procedure" and "manner" can be given the same substantive meaning. Black's Law Dictionary defines "procedure" as "1. A specific method or course of action. 2. The judicial rule or manner for carrying on a civil lawsuit or criminal prosecution." [48] And certainly, as the state points out, the Alaska Code of Civil Procedure is enacted by the legislature and establishes many substantive rights regarding when suits may be brought by establishing statutes of limitations, creating causes of action, and creating immunities and limitations on liabilities. Moreover, the state argues, the drafters of the constitution generally assigned the judicial branch the primary authority for making procedural rules relating to civil litigation while reserving to the legislature the power to define substantive rights.

Glover's argument that the style and drafting committee impliedly made a substantive

---

**43.** *Id.* at 3048.

**44.** 5 PACC 3178 (Jan. 26, 1956).

**45.** 4 PACC 2818–45 (Jan. 21, 1956).

**46.** Alaska Const. art. XII, § 11 provides:

As used in this constitution, the terms "by law" and "by the legislature," or variations of these

terms, are used interchangeably when related to law-making powers. Unless clearly inapplicable, the law-making powers assigned to the legislature may be exercised by the people through the initiative, subject to the limitations of article XI.

**47.** *See infra* Part IV.A.5.

**48.** Black's Law Dictionary 1241 (8th ed.2004).

change to the provision on state sovereign immunity ignores the fact that the chairman of the style and drafting committee explicitly denied that the committee had made any substantive changes.[49] We therefore decline to draw any meaning in the change from "in what manner" to "the procedures."

### iii. Use of "shall"

Glover also argues that the word "shall" denotes "mandatory." His argument points out the numerous times that "shall" refers to provisions which are not optional. This argument, like the argument on the self-executing provision of the constitution, dodges the real question. The convention clearly intended to force the legislature to establish procedures for waiving the state's sovereign immunity. The question before this court is whether the drafters intended that waiver to be an *absolute waiver* or in the alternative intended to abolish only *absolute immunity.* The use of the word "shall" does not bolster Glover's interpretation.

In sum, we conclude that the changes made by the style and drafting committee were not intended to create an absolute waiver of sovereign immunity.

### 4. The legislative history of AS 09.50.250 supports less than absolute waiver.

Glover next argues that the legislative history of the act allowing tort claims against the state, now codified at AS 09.50.250, supports his interpretation of the sovereign immunity waiver. As Glover notes, in 1957 the Alaska Territorial Legislature passed an act authorizing some civil actions against the territory and prohibiting others.[50] In 1961 the Alaska legislature created a revised civil code

that included procedures for suing the state.[51]

Glover notes that the 1962 legislature eventually enacted AS 09.50.250 with wording very similar to the 1957 act, except that it did not directly assert the waiver of sovereign immunity but instead implied that it already existed.[52] Glover implies that the lack of words of waiver indicate that the waiver already existed elsewhere—the constitution—and did not originate with the statute. However, the same statute included several exceptions to the state's waiver of sovereign immunity. Those accompanying statutory provisions limiting the waiver provide even stronger indicia that the type of waiver in the constitution is not absolute. Again, Glover assumes that the only two options are to ignore the constitutional provision or to assume that it operates as an absolute waiver of immunity. The third alternative, that the constitutional provision mandated a waiver of absolute immunity but not a complete waiver of all immunity, is most consistent with the subsequent statutes.

### 5. Other states interpret similar constitutional provisions as allowing the legislature to limit suits against the state.

The state notes that other states with similar constitutional provisions have construed their constitution to allow the legislature to decide sovereign immunity in specific instances.[53] Most persuasively, Arizona, from whose constitution Alaska derived its waiver provision, has since interpreted its provision to confer upon its legislature the power to "define those instances in which public entities and employees are entitled to

---

**49.** 5 PACC 3178 (Jan. 26, 1956).

**50.** Territory of Alaska, Session Laws, ch. 170, SLA 1957.

**51.** Alaska Legislative Council, Memorandum "Revised Code of Civil Actions and Proceedings" (Feb. 17, 1961) at 23.

**52.** Where the 1957 act said "Any person or corporation having any claim ... shall have a right of civil action against the Territory ...," the 1962 statute said, "Any person or corporation

having a claim against the state may bring an action against the state in the superior court."

**53.** *See, e.g., Krause v. State,* 31 Ohio St.2d 132, 285 N.E.2d 736, 742 (1972) (constitutional provision inserted "to abolish the defense of governmental immunity ... not to make the state amenable to suit without its express consent"); *Kallembach v. State,* 129 Wis.2d 402, 385 N.W.2d 215, 218 (App.1986) ("[T]here must exist *express legislative authorization* in order for the state to be sued.") (quotations omitted, emphasis in original).

immunity." [54] This interpretation, stemming as it does from a 2001 case, was of course not available to the delegates during the convention and thus cannot be considered dispositive of their intent. However, the delegates expressly acknowledged that the states with sovereign immunity provisions allowed suit against the state "under various restrictions." [55] Glover argues that the interpretations of other states' constitutional provisions, including Arizona's, rely on interpretations of words which were excised from the final wording of the Alaska provision. We agree that the interpretations of other states are not dispositive. Nonetheless, they represent persuasive authority that the constitution did not waive all sovereign immunity.

### 6. Alaska Statute 09.50.250(5) does establish "procedures" within the meaning of article II, § 21 of the Alaska Constitution.

The superior court noted that the statute Glover challenges does, in fact, provide a procedure for suits against the state. Rather than simply asserting sovereign immunity from suits by state-employed seamen, AS 09.50.250(5) provides that the seamen may bring claims within the workers' compensation system. In *State v. Zia, Inc.*[56] we upheld the statutory substitution of an administrative process in lieu of civil litigation against the state, and limited the claimant to the available administrative remedies.[57] The *Zia* rationale is equally applicable to the

instant case. Even if the state's constitutional waiver of sovereign immunity was absolute, as Glover claims, the state could still direct that workers' compensation is the procedure by which such suit must proceed.

In sum, we conclude that AS 09.50.250(5) does not violate article II, section 21 of the Alaska Constitution.

### B. The Jones Act Does Not Supercede AS 09.50.250(5).

Glover next argues that federalism mandates that the Jones Act supercede AS 09.50.250(5). For the reasons explained below, we disagree.

The interaction between the Jones Act and AS 09.50.250(5) involves an intertwining of two principles of federalism. The first principle is the supremacy of federal law.[58] Glover argues that the supremacy of federal law means that federal jurisdiction over maritime and admiralty law [59] preempt the state's ability to provide compensation to workers in the realm of maritime law. The second principle is our federal system's recognition of state sovereign immunity.[60] The state argues that state sovereign immunity prevents the federal cause of action under the Jones Act from forcing open state courthouse doors.

We conclude that the precedent set by the federal government and other states in applying workers' compensation remedies to government-employed seamen is sufficient reason to hold that the Jones Act does not

---

**54.** *Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 16 P.3d 757, 764 (2001).

**55.** Alaska Constitutional Convention Legislative Branch Committee, Commentary on Proposed Article on Legislative Branch (Dec. 14, 1955) (Alaska State Archives: Constitutional Convention 310.05 at 5).

**56.** 556 P.2d 1257 (Alaska 1976).

**57.** *Id.* at 1261.

**58.** This derives from the supremacy clause of the U.S. Constitution. U.S. Const. art. VI.

**59.** The U.S. Constitution extends the federal judicial powers to "all cases of admiralty and maritime jurisdiction." U.S. Const. art. III, § 2.

**60.** State sovereign immunity is addressed in the Eleventh Amendment to the Constitution, but the

Supreme Court has held that "as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the State's immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today." *Alden v. Maine*, 527 U.S. 706, 729, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). Accordingly, the Eleventh Amendment confirms state sovereign immunity but does not by its terms limit it: "The Eleventh Amendment confirmed, rather than established, sovereign immunity as a constitutional principle; it follows that the scope of the States' immunity from suit is demarcated not by the test of the Amendment alone but by fundamental postulates implicit in the constitutional design." *Id.* at 728–29, 119 S.Ct. 2240.

preempt the state's ability to provide a remedy. We also agree with the state that sovereign immunity bars suit under the Jones Act.

Below, we consider each of the two component questions (the preemption of compensation remedies by the Jones Act and the inability of the federal government to enforce the Jones Act against the state) in greater detail. We then address Glover's third federalism argument—that AS 09.50.250(5) impermissibly discriminates against a federal cause of action.

### 1. The Jones Act does not preempt and therefore does not prohibit state attempts to modify remedies available to state-employed seamen.

Glover argues that the U.S. Constitution prohibits the application of state workers' compensation remedies to seamen, and uses this argument to suggest that the state has removed a constitutional remedy (Jones Act suits) and replaced it with an unconstitutional one (state workers' compensation). While Glover's arguments have some historical precedent, we disagree with his conclusion that application of workers' compensation to state employees violates the U.S. Constitution.

At the beginning of the 20th century, Congress acted to provide railroad workers with an effective right to compensation for workplace injuries. It passed the Federal Employer's Liability Act (FELA) but failed to make any provision for injured maritime workers.[61] The Supreme Court struck down attempts by states to apply their own workers' compensation acts to maritime workers,[62] even after Congress passed legislation authorizing the use of state compensation acts to compensate seamen.[63] In response, Congress extended FELA to seamen through the Jones Act. Case law from FELA now applies to Jones Act cases.[64] The existence of this federal remedy raises the issue of federal preemption.

We addressed the issue of preemption in *Anderson v. Alaska Packers Association*,[65] in which we affirmed the workers' compensation board's denial of workers' compensation benefits to a privately employed fisherman.[66] In *Anderson* we concluded that the federal government had exclusive jurisdiction over any admiralty case.[67] We held that *Southern Pacific Co. v. Jensen's*[68] declaration that states were constitutionally barred from applying their compensation systems to maritime injuries was still good law where the injuries were maritime in character.[69] The acknowledged policy behind barring state supplementation of maritime law was "to ensure a nationally uniform system of maritime

---

61. U.S.C. ch. 149, §§ 1–10, 35 Stat. 66 (1908) (codified as amended at 45 U.S.C. §§ 51–60).

62. *S. Pac. Co. v. Jensen*, 244 U.S. 205, 217, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (holding that where Congress was silent on matter of interstate commerce, commerce was to be free and New York could not apply its workers' compensation statute to foreign ships visiting its ports); *see also Mondou v. New York, New Haven, & Hartford R.R. Co.*, 223 U.S. 1, 54–55, 32 S.Ct. 169, 56 L.Ed. 327 (1912) ("[P]rior to the present act, the laws of the several states were regarded as determinative of the liability of employers engaged in interstate commerce for injuries received by their employees while engaged in such commerce.... [But n]ow that Congress has acted, the laws of the states, in so far as they cover the same field, are superseded, for necessarily that which is not supreme must yield to that which is.").

63. *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 163–64, 40 S.Ct. 438, 64 L.Ed. 834 (1920) ("Congress undertook to permit application of workmen's compensation laws of the several states to

injuries within the admiralty and maritime jurisdiction.... [T]he enactment is beyond the power of Congress."); *Washington v. W.C. Dawson & Co.*, 264 U.S. 219, 227–28, 44 S.Ct. 302, 68 L.Ed. 646 (1924) (holding that 1922 statute attempting to extend state workers' compensation to injured maritime workers exceeded congressional authority because maritime law required uniform federal action).

64. *Abbott v. State*, 979 P.2d 994, 996 (Alaska 1999).

65. 635 P.2d 1182 (Alaska 1981).

66. *Id.* at 1186.

67. *Id.* at 1183–84 (citing U.S. Const. art. III, § 2 and 28 U.S.C. § 1333).

68. 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).

69. *Anderson*, 635 P.2d at 1184–85.

law." [70] As the superior court noted, however, these key cases involved privately employed seamen, and thus did not involve the issue of state sovereignty.

■ Two factors lead to a different conclusion regarding the constitutionality of a state remedy for state-employed seamen. First, the federal government provides at least some of its employed seamen with federal workers' compensation,[71] as do several other states.[72] These cases suggest that where a sovereign declines to submit to Jones Act suits, no constitutional principles are violated by substituting workers' compensation. Second, the case law justifying preemption has either failed to weigh the conflicting federal principle of state sovereign immunity at issue here or has been significantly narrowed by more recent U.S. Supreme Court cases, as discussed extensively below. These factors lead us to conclude that the Federal Constitution does not prohibit the application of state workers' compensation to state-employed maritime workers, and therefore allows us to evaluate Glover's rights and the state's assertion of sovereign immunity in light of the fact that Glover is entitled to receive the remedy of workers' compensation.

### 2. The Jones Act does not give state-employed seamen the right to sue the state without explicit state consent.

■ Glover argues that his right to sue the state under the Jones Act does not require explicit state consent. But the superi-

or court correctly held that under *Alden v. Maine*[73] the only times a private party may sue the state are (1) if the state consented, (2) if Congress had validly abrogated the need for state consent, or (3) under *Ex parte Young.*[74] The parties do not attempt to argue this case falls under *Ex parte Young.* It is uncontested that the state does not consent—it has attempted to withdraw its consent to suit through AS 09.50.250(5). Because we hold today that the Alaska Constitution did not foreclose that limited statutory assertion of sovereign immunity, we also hold that the state has withdrawn its consent to be sued. Thus, the only remaining issue is whether Congress, through the Jones Act, has validly abrogated the requirement that a state consent to suit.

The Supreme Court has issued two conflicting rulings on the applicability of the Jones Act to non-consenting states. In 1987 the Court in *Welch v. Texas Department of Highways and Public Transportation*[75] held that an employee could not bring a Jones Act claim against her state in *federal* court because the federal legislation lacked a clear statement of congressional intent to abrogate state sovereign immunity.[76] Four years later, in *Hilton v. South Carolina Public Railways Commission,*[77] the Court extended the Jones Act to state employers who did not consent to be sued. The *Hilton* Court concluded that the states had constructively consented to suit on the basis of *stare decisis*— any state entering the common-carrier business should have been on notice that these

---

**70.** *Id.* at 1184 (citing *The Lottawanna,* 88 U.S. (21 Wall.) 558, 575, 22 L.Ed. 654 (1874)).

**71.** 5 U.S.C. §§ 8101–93.

**72.** *Maloney v. State,* 3 N.Y.2d 356, 165 N.Y.S.2d 465, 144 N.E.2d 364, 366 (1957) (holding that exclusive remedy of state employed seamen is workers' compensation); *Midgett v. North Carolina Dep't of Transp.,* 152 N.C.App. 666, 568 S.E.2d 643, 671 (2002) (holding that state tort claims act does not waive sovereign immunity to Jones Act claims by state employee); *Ortega v. Port of Portland,* 147 Or.App. 489, 936 P.2d 1037, 1039 (1997) (holding general maritime law does not preempt Oregon's assertion of sovereign immunity for state-employed seamen entitled to workers' compensation); *Lyons v. Texas A & M*

*Univ.,* 545 S.W.2d 56 (Tex.App.1976) (holding workers' compensation act remedies exclusive where state asserts sovereign immunity from Jones Act suit).

**73.** 527 U.S. 706, 755–58, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

**74.** 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

**75.** 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987).

**76.** *Id.* at 475, 107 S.Ct. 2941.

**77.** 502 U.S. 197, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991).

employees had long had the federal remedy available to them.[78]

The superior court, in a well-reasoned analysis, carefully explored this contradiction and concluded that *Hilton* has been subsequently narrowed so much by *Alden v. Maine*,[79] *Seminole Tribe of Florida v. Florida*,[80] and *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*[81] as to be inapplicable to the current case. We adopt that portion of the superior court's analysis and attach it as Appendix A below. We conclude, moreover, that the present case is distinguishable from *Hilton* because Glover has access to another remedy, that provided by the state workers' compensation act, while the injured employee in *Hilton* did not.[82] This distinction is particularly compelling because *Hilton* emphasized the importance of the "practical adverse effects" of allowing an assertion of sovereign immunity,[83] whereas here the state employees are eligible for workers' compensation.

Finally, Glover argues that even though a *federal* court could not force the state's consent, this court should take a novel approach to sovereign immunity and abrogate the state's sovereign immunity in order to respect Glover's constitutional rights. Glover notes that the state of Maine chose to consent to suit in *Welch v. State of Maine*.[84] We consider and reject this argument in Part IV.C. below, concluding that Glover's constitutional rights have not been violated by AS 09.50.250(5).

### 3. Alaska Statute 09.50.250(5) does not discriminate against a federal cause of action.

■ Glover alleges that under *Alden* the state's application of sovereign immunity is ineffective because it is targeted at a single federal cause of action. In *Alden* the Supreme Court concluded that Maine had not waived its sovereign immunity and thus could not be sued under the Fair Labor Standards Act.[85] The Court noted that

> [T]here is no evidence that the State has manipulated its immunity in a systematic fashion to discriminate against federal causes of action. To the extent Maine has chosen to consent to certain classes of suits while maintaining its immunity from others, it has done no more than exercise a privilege of sovereignty concomitant to its constitutional immunity from suit.[86]

The default position under Maine law was sovereign immunity.[87] Maine carved out several exceptions to this default position that did not include the cause of action in question.[88] Here, by contrast, the default position under Alaska law is a waiver of sovereign immunity and the statute was enacted to reassert immunity in this specific instance, making it arguably a specific federal cause of action.

Glover has seized upon the *Alden* Court's language to suggest that because the legislature specifically targeted Jones Act suits in AS 09.50.250(5), the statute is impermissible. We reject this argument for two reasons. First, the language in *Alden* that Glover relies on was dicta. The Court was responding to the allegation that Maine had discriminated against a federal cause of action by finding that there was no evidence of any discriminatory manipulation.[89] The Court did not explain what the consequence of an explicit attempt to discriminate against a federal cause of action would have been, and in the absence of better explanation of the sig-

---

**78.** *Id.* at 205–07, 112 S.Ct. 560.

**79.** 527 U.S. 706, 736–38, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

**80.** 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

**81.** 527 U.S. 666, 680, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

**82.** *See Hilton*, 502 U.S. at 202–03, 112 S.Ct. 560.

**83.** *Id.* at 204, 112 S.Ct. 560.

**84.** 853 A.2d 214 (Maine 2004).

**85.** 527 U.S. at 758, 119 S.Ct. 2240.

**86.** *Id.*

**87.** *Id.* at 757–58, 119 S.Ct. 2240.

**88.** *Id.* at 758, 119 S.Ct. 2240.

**89.** *Id.*

nificance of such discrimination we have no cause to rule a statute unconstitutional on this basis. Second, despite the fact that a federal cause of action was specifically named in this statute, there is no evidence that the state was discriminating against it. To the contrary, the stated purpose of the amendment was uniformity, not discrimination. State-employed seamen are treated under the statute in the same way as all other state employees by receiving full access to the workers' compensation system.

### C. Alaska Statute 09.50.250(5) Does Not Violate Glover's Rights to Due Process, Access to the Courts, Jury Trial, or Equal Protection Under the Alaska Constitution.

Glover argues that AS 09.50.250(5) violates several of his state constitutional rights by depriving him of access to the courts, due process, and jury trial. He also argues that because it discriminates between state employees and privately employed seamen, the statute violates equal protection. Because Alaska equal protection analysis involves a sliding scale depending on the rights impinged upon, we begin the analysis with an examination of Glover's other rights and then address his equal protection claim.

### 1. The statute does not violate Glover's right to a jury trial.

 Glover argues that the legislation violates his right to a jury trial provided by article I, section 16 of the Alaska Constitution. However, that section preserves the right of trial by jury "to the same extent as it existed at common law." [90] As the state notes, at common law there was no right to sue the sovereign and therefore no right to a jury trial in such a suit.[91] Additionally, the constitutional convention considered proposals extending the right to a jury trial to all suits brought in the superior court and re-

jected those proposals.[92] Finally, Alaska law did not provide a jury trial for suits against the state until 1975,[93] additional proof that the right of a jury trial against the government did not exist at common law. In light of these facts, we hold that AS 09.50.250(5) does not violate Glover's right to trial by jury.

### 2. The statute does not violate Glover's due process right to access the courts.

 Glover asserts that the statute violates his due process right to access the superior court. We examined a related issue in *Arctic Structures, Inc. v. Wedmore*,[94] where we upheld Alaska's workers' compensation statute despite the fact that it changed the procedural remedy available to workers injured on the job. We defined the worker's due process right as a right to a "substantial and efficient remedy" rather than a right to sue in the superior court.[95] Because the state substituted Glover's former right to sue under the Jones Act for the right to pursue claims under the workers' compensation system, Glover continues to have access to a substantial and effective remedy. For this reason, the statute does not violate Glover's due process rights.

### 3. The statute does not violate Glover's right to equal protection.

 Glover asserts that AS 09.50.250(5) violates his right to equal protection. Equal protection analysis involves a three-step process under the Alaska Constitution, in which the court determines the weight of the individual interest at stake, the importance of the government's interest, and the closeness of the fit between the statute and the government's objective. As we re-

---

**90.** ALASKA CONST. art. I, § 16.

**91.** *See Alden*, 527 U.S. at 713, 119 S.Ct. 2240.

**92.** 2 PACC 1351–52, 1355 (Jan. 6, 1956); *see Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1050 (Alaska 2002) (analyzing right to jury trial in the context of damage caps).

**93.** Former AS 09.50.290. Repealed by ch. 147, § 1, SLA 1975.

**94.** 605 P.2d 426 (Alaska 1979).

**95.** *Id.* at 436.

cently summarized in *C.J. v. State, Department of Corrections:* [96]

> We analyze equal protection claims under a sliding scale approach which places a greater or lesser burden on the state to justify a classification depending on the importance of the individual right involved. If the right impaired by the challenged legislation is not very important, the State need only show that its objectives are legitimate and that the legislation bears a substantial relationship to its purpose. At the other end of the continuum, legislation that impairs one of the most important individual interests will be upheld only if it furthers the State's compelling interest and if it is the least restrictive means available to achieve the State's objective.[97]

The state argues that before applying such a test, the court must first determine whether the statute is an exercise of the state's police power which classifies similarly situated people differently.

### i. Threshold analysis: The statute treats similarly situated people disparately.

The state argues that equal protection analysis is only applied after a party has met the "threshold showing necessary for an equal protection claim." [98] In *Matanuska–Susitna Borough School District v. State*[99] we held, "Where there is no unequal treatment, there can be no violation of the right to equal protection of law." [100] The state ar-

gues that Glover does not meet this threshold showing.

■ The state's argument is unavailing.[101] While it is true that the statute treats all state employees alike, it also treats state-employed seamen differently from privately employed seamen performing the same work and facing the same risks. Under these circumstances we believe that the situation survives threshold analysis and merits application of the sliding scale test.

### ii. Glover's interest

Glover argues that his fundamental interests are affected, including his rights under the Jones Act, his right to a jury trial, and right to access the courts. Because we have already held his jury trial and court access arguments unavailing Glover's only remaining interest is his right to sue under the Jones Act.

■ The state characterizes Glover's interest as "economic" and as "the interest in suing a particular entity" and notes that both interests are of limited constitutional importance. In *Wilson v. Municipality of Anchorage,*[102] we found that Wilson's interest in suing a particular entity was not fundamental.[103] In *Evans ex rel. Kutch v. State,* we held that the plaintiff's interests in unlimited damages were merely economic and "do not count as important interests under our equal protection interest." [104] In *Gilmore v. Alaska Workers' Compensation Board,*[105] we held

96. 151 P.3d 373 (Alaska 2006).

97. *Id.* at 378 (quotations and citations omitted).

98. *See Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1068 (Alaska 2002).

99. 931 P.2d 391 (Alaska 1997).

100. *Id.* at 397 (upholding statute requiring local contribution for educational expenses without applying sliding scale because plaintiffs did not make threshold showing that educational interests of the children were disparately affected).

101. The state also cites to *Krause v. State,* 31 Ohio St.2d 132, 285 N.E.2d 736 (1972), as persuasive authority that equal protection does not operate as a backdoor mechanism to force state courts open to suits merely because the state allows for causes of action against private enti-

ties in similar circumstances. We decline to reach the question whether the assertion of sovereign immunity will ever give rise to a successful equal protection claim.

102. 669 P.2d 569 (Alaska 1983).

103. *Id.* at 572 (holding that prohibition on suing municipality for negligent health or safety inspections did not violate equal protection where other remedies, namely suing private individual responsible for the violations were still available).

104. 56 P.3d 1046, 1052–53 (Alaska 2002).

105. 882 P.2d 922 (Alaska 1994), *superceded by statute as recognized in Dougan v. Aurora Elec. Inc.,* 50 P.3d 789, 797 (Alaska 2002).

that interest in workers' compensation benefits warranted scrutiny at the low end of the scale.[106]

Because Glover has workers' compensation available to him, what he is deprived of in this case is only the right to sue the entity of his choice and potentially the ability to collect a greater amount of money. Because Glover's interests are economic, the state's classification need only bear a "fair and substantial relationship" to the government's "legitimate purpose" behind the statute in order to survive.[107]

### iii. The state's interest

 Glover argues the state's interest is illegitimate because it violates his Jones Act rights. We find this argument unpersuasive.[108] The transmittal letter accompanying the bill which eventually became AS 09.50.250(5) stated that the bill "would provide a uniform equitable remedy for work injuries of all state employees under a single compensation system."[109] The letter also indicated that having one system would save adjudication costs and lower the cost to the state.[110] We agree with the superior court that AS 09.50.250(5)'s purpose of creating a uniform employee compensation system is legitimate.

### iv. Closeness of the fit

 We turn to the question whether the state has established a "fair and substantial" relationship between the statute and the state's objective. In this case, the legislation narrowly targets the state's objective to cre-

ate a uniform system for compensating state employees. The legislation is aimed at the "only state employees presently authorized to file a direct civil (negligence) action against their employer for on-the-job injury or illness."[111] Moreover, we have held that there is a substantial fit between the objectives of Alaska's workers' compensation system and the limitations it places on the employer's liability.[112]

Glover argues that the means do not fit the end because injured seamen will simply seek refuge in Washington state courts under the Jones Act and will thereby prevent uniformity and increase Alaska's litigation costs. The state strongly disagrees that this would be a viable avenue for Glover, arguing that the foreign court either must respect Alaska's sovereign immunity in a situation such as this where there is no choice of law issue or that the court ought to do so for reasons of comity.[113] We take judicial notice of the fact that a case Glover filed in the trial court of Washington state has been dismissed for just this reason, and is currently on appeal.[114] More importantly, we hold that because only a fair and substantial fit is needed, any errant cases heard in Washington state will not invalidate the statute.

In sum, AS 09.50.250(5) passes constitutional muster under equal protection analysis because the legislation impacts an economic right and bears a fair and substantial relationship to the legitimate governmental objective of creating a uniform system for compensating state employees.

---

**106.** *Id.* at 926–27.

**107.** *See id.* at 927.

**108.** Glover's citation to the "illegitimate" interests the court referred to in *Malabed v. N. Slope Borough,* 70 P.3d 416, 421–22 (Alaska 2003), is distinguishable because *Malabed* involved racially based hiring preferences. Enacting a statute which will result in different compensation schemes for state employees and private employees is not comparable to instituting racially based preferences.

**109.** 2003 House Journal 435.

**110.** *Id.* at 436.

**111.** *Id.* at 435–36.

**112.** *Arctic Structures, Inc. v. Wedmore,* 605 P.2d 426, 437 (Alaska 1979).

**113.** As the state notes in its brief, Washington courts have previously declined to hear cases against the State of Oregon on comity grounds. *Williams v. State,* 76 Wash.App. 237, 885 P.2d 845, 852 (1994); *Fernandez v. State,* 49 Wash. App. 28, 741 P.2d 1010, 1017 (1987).

**114.** *Glover v. State of Alaska, Dep't of Transp., Alaska Marine Highway Sys.,* No. 05–2–02811–1, Order Granting Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Wash.Super.Ct. Feb. 2, 2007).

## D. The Superior Court Did Not Abuse Its Discretion in Reducing the Award of Attorney Fees to $1000.

The state argues that the superior court erred in reducing the award of attorney's fees to the state to $1000 under Civil Rule 82(b)(3)(K).[115] The superior court found that the "presumptive" award of fees to the state is $12,940.97, which was twenty percent of actual, reasonable fees. The court reduced the fee award to $1000 based on equitable factors.

The state contends that Glover should not be treated as a public interest litigant. The state argued and won this point below. Judge Collins held that the action was "clearly motivated primarily by a private economic interest in damages,"[116] a determination Glover does not appeal. The state reiterates its argument in briefing before this court, this time adding that the superior court's substantial fee reduction amounted to an impermissible *de facto* application of the public interest litigant exception.

 We disagree with the state's characterization of the superior court's action. The public interest litigant exception is not the exclusive avenue whereby a variation on presumptive awards may be justified. In our recent decision in *State v. Native Village of Nunapitchuk*,[117] we upheld the constitutionality of an act eliminating the public interest litigant exception but also noted that:

> [Rule 82(b)(3)(I) ] continues to apply to all cases, without discriminating between those brought for self-interested reasons and those intended to effectuate public policies. Trial courts remain free to reduce awards that would otherwise be so onerous to the losing party as to deter similarly situated litigants—including litigants that would have previously been identified as public interest litigants—from accessing

the courts. In determining whether an award would deter similarly situated litigants from accessing the courts, trial courts may continue to consider all relevant factors, including the nature of the claim advanced and the economic incentives for similarly situated litigants to bring similar claims.[118]

Judge Collins cited several unusual circumstances that led to her determination that the fee award should be reduced. Those circumstances included the fact that one motivation behind Rule 82—to encourage settlements— was "almost certainly not considered" by the state because of the significant constitutional issues involved. We agree, but believe that the superior court's decision was more consistent with the rationale expressed in Rule 82(b)(3)(I) and (J).

Subsection (I) provides that the court may vary an award based on "the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts." Subsection (J) provides for variation based on "the extent to which the fees incurred by the prevailing party suggest that they had been influenced by considerations apart from the case at bar, such as a desire to discourage claims by others against the prevailing party. . . ." Glover, as the first seaman to challenge this statute, faced a disproportionate financial burden because the state was defending the statute in order to preserve its immunity with respect to all mariners in the future, and thus was likely to invest significant resources in the case and very unlikely to settle. Moreover, Judge Collins noted that the only issue actually litigated was a constitutional question of first impression, and that both parties submitted excellent briefing.

---

115. Civil Rule 82(b)(3)(K) authorizes the superior court to consider "other equitable factors deemed relevant" for the purpose of determining if a variation from the presumptive fee is warranted.

116. A party does not qualify as a public interest litigant under Alaska case law if he would have had "sufficient economic incentive to file suit even if the action involved only narrow issues

lacking general importance." *Murphy v. City of Wrangell,* 763 P.2d 229, 233 (Alaska 1988).

117. 156 P.3d 389 (Alaska 2007).

118. *Id.* at 406. Because the act only applied to cases filed after its effective date, the statute was not considered by the superior court or the parties in this case.

The state cites *F/V American Eagle v. State*[119] for the proposition that economically motivated private litigation does not meet the requirement to bar an award of costs even where the case touches upon constitutional issues. However, *F/V American Eagle* is distinguishable by its posture. In that case we determined that the litigant was not entitled to public interest litigant status as a matter of law, and so finding, held that the trial court's discretionary award of fees was reasonable.[120] Here, in contrast, the court exercised its discretion to determine that a reduction in the fee award was warranted. Because the court did not abuse its discretion in awarding fees and because the award was not manifestly unreasonable, we affirm the award of fees.

## V. CONCLUSION

We AFFIRM the superior court's opinion on all counts, holding that AS 09.50.250(5) is constitutional because it does not violate article II, section 21 of the Alaska Constitution, is not preempted by the Jones Act, and does not violate Glover's rights to due process, court access, jury trial, or equal protection under the Alaska Constitution. We AFFIRM the superior court's reduction of attorney's fees because the award was not manifestly unreasonable.

BRYNER, Justice, not participating.

### APPENDIX A [1]

### IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

### FIRST JUDICIAL DISTRICT AT JUNEAU

JESSE GLOVER, Plaintiff,

v.

STATE OF ALASKA, DEPT. OF TRANSPORTATION, ALASKA MARINE HIGHWAY SYSTEM, Defendant.

**119.** 620 P.2d 657, 673–74 (Alaska 1980).

**120.** *Id.*

**1.** We have edited the superior court's decision to conform to our technical rules.

Case No. 1JU–04–535CI

ORDER ON PLAINTIFF GLOVER'S MOTION FOR DECLARATORY JUDGMENT AND STATE'S MOTION FOR SUMMARY JUDGMENT

. . . .

**1. Alaska withdrew consent to Jones Act and general maritime suits by state employees by enacting AS 09.50.250(5).**

It is not disputed that Alaska withdrew its consent to be sued in state court for Jones Act and general maritime claims by injured state employees by enacting AS 09.50.250(5). Glover argues, however, that because Alaska chose to enter the field of maritime commerce, it implicitly or constructively consented to Jones Act and maritime suits in its own courts.

Glover cites *Hilton v. South Carolina Public Railways Commission*[2] as support for a theory of constructive consent to suit. *Hilton* concerned an injured employee of a state-owned railroad that sued his state employer under the Federal Employers' Liability Act (FELA). The Court held that South Carolina was subject to suit by an injured state employee suing under FELA (and, by implication, the Jones Act) and that the Eleventh Amendment immunity of the state did not bar the suit.[3]

The *Hilton* decision relied on the court's 1964 interpretation of FELA language in *Parden v. Terminal Railway of Alabama Docks Department*[4] and general principles of *stare decisis* that courts should generally stand by settled principles of law. In the 1964 decision in *Parden* the Court held that "when Congress enacted FELA and used the phrase '[e]very common carrier by railroad,' 45 U.S.C. § 51, to describe the class of employers subject to its terms, it intended to

**2.** 502 U.S. 197, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991).

**3.** *Id.* at 204–05, 112 S.Ct. 560.

**4.** 377 U.S. 184, 187–88, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).

include state-owned railroads."[5] The *Parden* Court further held that states that engaged in interstate commerce by operating railroads constructively consented to suits under FELA.[6] The *Parden* Court also held that FELA was enacted in the exercise of Congress' "constitutional power to regulate interstate commerce."[7]

In 1987, the U.S. Supreme Court overruled that portion of *Parden* that stood for the proposition that FELA constituted a waiver of the Eleventh Amendment in *Welch v. Texas Department of Highways & Public Transportation.*[8] In *Welch,* a Jones Act suit against the State of Texas was brought in federal court. The Court held that the Jones Act, which applies the FELA's remedial provisions to seamen, does not amount to a clear statement of Congressional intent to abrogate the states' Eleventh Amendment[9] sovereign immunity.[10] The Court held that employee Welch could not bring her Jones Act claim against the state in federal court in the absence of a clear statement in the legislation to abrogate state sovereign immunity.[11]

*Hilton* was decided in 1991. The *Hilton* majority concluded that upsetting the long-standing FELA liability rule set forth in *Parden* in state court actions would be unfair, particularly since Hilton would be left with no remedy for his injuries unless his FELA claim was recognized and since many states' workers' compensation laws specifically exclude railroad workers from coverage because of the assumption that FELA pro-

vides adequate protection for those workers.[12]

The *Hilton* court recognized that its decision represented an exception to the "clear statement rule" announced in *Welch.*[13] The court held that the cases were distinguishable because the Eleventh Amendment does not apply in state courts and, thus, the *Parden* decision was based solely on principles of statutory construction of FELA as opposed to the constitutional construction issues presented in *Welch.*[14]

The tension between *Welch* and *Hilton* is unmistakable, as noted in Justice O'Connor's dissent in *Hilton.* With clear insight into future supreme court decisions on state sovereign immunity, she stated:

> The clear statement rule is not a mere canon of statutory interpretation. Instead, it derives from the Constitution itself. The rule protects the balance of power between the States and the Federal Government struck by the Constitution. Although the Eleventh Amendment spells out one aspect of that balance of power, the principle of federalism underlying the Amendment pervades the constitutional structure.... [15]

Eight years after *Hilton,* the Court decided *Alden v. Maine.*[16] In the 1999 decision in *Alden,* the Court indicated that *Hilton* is to be narrowly construed. The *Alden* Court explained that suit against the state in *Hilton* was allowed because the state, [by entering into the railroad business after the

---

5. *Hilton,* 502 U.S. at 201, 112 S.Ct. 560 (quoting *Parden,* 377 U.S. at 187–88, 84 S.Ct. 1207).

6. *Parden,* 377 U.S. at 192, 84 S.Ct. 1207.

7. *Id.* at 190–91, 84 S.Ct. 1207.

8. 483 U.S. 468, 476–78, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987).

9. The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."

10. *Welch,* 483 U.S. at 475, 107 S.Ct. 2941 ("Congress has not expressed in unmistakable statutory

language its intention to allow States to be sued in federal court under the Jones Act.").

11. *Id.*

12. *Hilton v. South Carolina Pub. Ry. Comm'n,* 502 U.S. 197, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991).

13. *Id.*

14. *Id.*

15. *Id.* at 209, 112 S.Ct. 560 (O'Connor, J., dissenting).

16. 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

Court had earlier held that all who operated railroads would be subject to suit by injured workers under FELA effectively] consented to suit by its injured railroad workers.[17] Sovereign immunity was not raised as an issue in *Hilton,* likely because the case was decided after the Court had decided *Parden v. Terminal Railway of Alabama Docks Department,*[18] which held that Alabama had "constructively" consented to suit by engaging in the railroad business after the enactment of FELA, but before the Court subsequently completely overruled *Parden's* theory of constructive waiver in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board.*[19]

The *Alden* majority described the limited import of *Hilton* as follows:

> Our decision was "controlled and informed" by *stare decisis.* A generation earlier we had held that because the FELA made clear that all who operated railroads would be subject to suit by injured workers, States that chose to enter the railroad business after the statute's enactment impliedly waived their sovereign immunity from such suits.... Some States had excluded railroad workers from the coverage of their workers' compensation statutes on the assumption that the FELA provided adequate protection for those workers. Closing the courts to FELA suits against state employers would have dislodged settled expectations and required an extensive legislative response.
>
> There is language in *Hilton* which gives some support to the position of petitioners here but our decision did not squarely address, much less resolve, the question of Congress' power to abrogate States' immunity from suit in their own courts. The

respondent in *Hilton* ... neither contested Congress' constitutional authority to subject it to suits for money damages nor raised sovereign immunity as an affirmative defense....

> ... When so read, we believe the [*Hilton*] decision is best understood not as recognizing a congressional power to subject nonconsenting States to private suits in their own courts, nor even as endorsing the constructive waiver theory of *Parden,* but as simply adhering, as a matter of *stare decisis* and presumed historical fact, to the narrow proposition that certain States had consented to be sued by injured workers covered by the FELA, at least in their own courts.[20]

On the same day in 1999 that *Alden* was decided, the Court also decided *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board.*[21] There, the Court stated that *Parden's* theory that states can constructively consent to waiver of their sovereign immunity by engaging in interstate commerce was overruled.[22] The Court stated:

> We think the constructive-waiver experiment of *Parden* was ill-conceived, and see no merit in attempting to salvage any remnant of it.... Whatever may remain of our decision in *Parden* is expressly overruled.[23]

The *Hilton* statutory construction theory was based on the theory expressed in *Pennsylvania v. Union Gas Co.*[24] that Congress has the power to unilaterally abrogate the States' immunity from suit under the Commerce Clause, under which FELA and the Jones Act were promulgated. *Union Gas* was overruled in *Seminole Tribe of Florida v. Florida.*[25]

**17.** *Id.* at 735–37, 119 S.Ct. 2240.

**18.** 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).

**19.** 527 U.S. 666, 680, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) ("[W]e cannot square *Parden* with our cases requiring that a State's express waiver of sovereign immunity be unequivocal.").

**20.** *Alden,* 527 U.S. at 736–38, 119 S.Ct. 2240 (citations omitted).

**21.** 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

**22.** *Id.* at 680, 119 S.Ct. 2219.

**23.** *Id.*

**24.** 491 U.S. 1, 17, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989).

**25.** 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). United States Supreme Court decisions in the area of sovereign immunity have been sharply divided and might be viewed as, at times, inconsistent. *See* Erwin Chemerinsky, Federal Jurisdiction § 7.3, at 398–

Unlike *Hilton*, sovereign immunity has clearly been raised as a defense in this case and AS 09.50.250(5) is unequivocal. Since there is no express consent to suit and since the theory of waiver of sovereign immunity by "constructive consent" by conduct has been overruled by the United States Supreme Court, there is no reasonable basis on which constructive consent to suit can be inferred in this case. Also, this is not a case where, as in *Hilton*, the injured worker is left without any remedy since AS 09.50.250(5) expressly provides for workers' compensation act benefits.

. . . .

/s/ Patricia Collins
Superior Court Judge

403 (3d ed.1999). However, several conclusions drawn by Professor Chemerinsky accurately reflect the current status of the law:

> [C]onstructive waiver of Eleventh Amendment immunity is virtually nonexistent. If it ever will exist, it will be in situations where Congress indicates a clear intent to make states liable in federal court if they engage in a particular activity, and then a state voluntarily chooses to engage in that conduct. The congressional desire to make states liable must be in 'unmistakable language in the statute itself' and it must be an area where the state realistically could choose not to engage in the activity.

*Id.* § 7.7, at 436 (citations omitted).

The current law is that Congress may authorize suits against state governments only when it is acting pursuant to § 5 of the Fourteenth Amendment. Congress may not override the Eleventh Amendment when acting under any other constitutional authority.

*Id.* at 437 (citations omitted).