**SECOND INJURY FUND, Appellant and Cross–Appellee,**

**and**

**Johanna DeLong, Appellant,**

**v.**

**ARCTIC BOWL and Alaska National Insurance Company, Appellees and Cross–Appellants.**

Nos. S–7092, S–7152.

Supreme Court of Alaska.

Dec. 13, 1996.

Toby N. Steinberger, Assistant Attorney General, Anchorage, and Bruce Botelho, Attorney General, Juneau, for Appellant and Cross–Appellee Second Injury Fund.

Allan E. Tesche, Russell, Tesche & Wagg, Anchorage, for Appellees and Cross–Appellants.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and SHORTELL, J. Pro Tem.*

OPINION

RABINOWITZ, Justice.

## I. INTRODUCTION

This case is an appeal from the superior court acting as an intermediate court of appeal from a decision of the Worker's Compensation Board. Second Injury Fund (SIF) appeals the superior court's decision granting reimbursement from the fund to Arctic Bowl[1] and its insurer, Alaska National Insurance Company, for payments made to Johanna DeLong, a former employee of Arctic Bowl.

SIF argues that Arctic Bowl is not entitled to reimbursement from the fund because its request for reimbursement was untimely, and because it did not make 104 weeks of compensation payments to DeLong for the injury on which the claim in question was made.

## II. FACTS AND PROCEEDINGS

Johanna Delong worked for Arctic Bowl from November 30, 1982, through July 18, 1988, as its snack bar manager. Her job included running errands and ordering for the snack bar as well as performing the duties of cook and cashier.

On December 25, 1983, Delong noticed a lump in her lower abdomen near the site of a surgical incision which had been made several years earlier during a hysterectomy. James Borden, M.D., diagnosed a ventral hernia and performed surgery to repair it.

In December 1986 DeLong felt her hernia "come out" after she lifted heavy soup pots while working at Arctic Bowl. William Montano, M.D., surgically repaired the ventral hernia on January 7, 1987. DeLong described her condition after the surgery as "considerably pretty fair." She returned to work at Arctic Bowl.

On November 8, 1987, DeLong was hospitalized because of work-related back pain. She was diagnosed with lumbosacral strain and "either nearly midline placed disc at L5 and S1 or laterally placed L4–5 disc on the right." This back injury constituted a qualifying pre-existing permanent physical impairment under AS 23.30.205(d)(2).

DeLong returned to work at Arctic Bowl after missing approximately two weeks of work because of the back injury. Sometime between April and July of 1988, DeLong's hernia recurred. On July 19, Dr. Montano again repaired the hernia. Though the operation was considered successful, it weakened DeLong's abdominal wall, restricting her from heavy lifting.

DeLong never returned to work at Arctic Bowl. Her physical condition prevented her

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. "Arctic Bowl" in the context of this litigation and appeal refers collectively to Arctic Bowl and its carrier, Alaska National Insurance Company.

from being able to perform the work of a cook or waitress.

On August 30, 1989, Lee Glass, an attorney for Arctic Bowl, took DeLong's deposition. On December 10, 1990, the Worker's Compensation Board approved a compromise and release agreement between DeLong and Arctic Bowl. On July 31, 1991, Dr. Montano met with an Arctic Bowl attorney. Dr. Montano explained that DeLong's July 19, 1988, surgery had weakened her abdominal wall. He signed an affidavit confirming his opinion on August 30.

On September 5, 1991, Arctic Bowl filed a new notice of injury with the Worker's Compensation Board and a Notice of Possible Claim against Second Injury Fund. On February 6, 1992, Arctic Bowl filed a Petition to Join Second Injury Fund and Claim for Reimbursement. The administrator of SIF denied Arctic Bowl's claim for reimbursement due to untimeliness. The administrator determined that Arctic Bowl had knowledge of the injury by August 30, 1989, the date of DeLong's deposition by Arctic Bowl's attorney. Given this date, Arctic Bowl would have had to file its Notice of Possible Claim within 100 weeks—by July 31, 1991. Its claim was filed on September 5, over a month late by SIF's chronology.

On July 22, 1992, Arctic Bowl submitted additional information and a revised affidavit by Dr. Montano, along with a renewed request for SIF reimbursement. On May 11, 1993, SIF answered Arctic Bowl's renewed request, rejecting the application because Arctic Bowl had not reported 104 weeks of payments for the July 19, 1988, injury.

The Petition for Second Injury Fund Reimbursement was submitted to the Worker's Compensation Board. The Board found that DeLong had experienced a second work-related injury on July 19, 1988, that Arctic Bowl had met the "combined effects" test of AS 23.30.205(a), and that the nature of the injury was discovered by Arctic Bowl on July 31, 1991. The Board further found that Arctic Bowl's notice of a possible claim against SIF was timely. However, the Board determined that under the terms of the compromise and release agreement, 104 weeks of payments had not been made on the 1988 injury.

Arctic Bowl appealed the Board's decision to the superior court and SIF cross-appealed. The superior court affirmed the Board's determination that Arctic Bowl's notice of a possible claim had been timely, and reversed the Board's decision that Arctic Bowl had not made 104 weeks of payments as required by AS 23.30.205(a). The case was remanded to the Board for a determination of the amount of compensation for which Arctic Bowl was entitled to reimbursement.

Thereafter, a final Decision and Order of the Board was entered by stipulation, setting the final amount of compensation benefits for which Arctic Bowl would be entitled to SIF reimbursement if the superior court's decision were to be upheld on appeal.[2] Final judgment was then entered by the superior court. This appeal and cross-appeal followed.

## III. *DISCUSSION*

### A. *Was Arctic Bowl's Notice of Possible Claim Timely?*[3]

■■■ SIF's first argument in support of its contention that Arctic Bowl is not eligible

---

**2.** Reimbursement of $20,035.70 was ordered. This amount was calculated by multiplying 104 weeks times $224.72 (the compensation rate) resulting in a figure of $23,370.88. Total disability payments made by Arctic Bowl were $43,406.58. Thus, subtracting $23,370.88 from $43,406.58 resulted in a reimbursement figure of $20,035.70.

**3.** Whether Arctic Bowl's time to file its Notice of Possible Claim runs from its discovery that an injury had occurred or from its discovery that an SIF-eligible injury had occurred is a question of law not within the special expertise of the Work-

er's Compensation Board, and therefore this court will substitute its judgment for that of the Board. *Sokolowski v. Best Western Golden Lion Hotel*, 813 P.2d 286 (Alaska 1991).

The timeliness of Arctic Bowl's Notice of Possible Claim also rests on disputed factual issues. As a question of fact, the Board's decision is subject to review under the "substantial evidence" standard. *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992).

The superior court's decision as an intermediate court of appeal is given no deference. We independently review the Board's decision. *Hes-*

for reimbursement from SIF is that DeLong did not suffer a new injury from the surgery on July 19, 1988. SIF convincingly, and uncontroversially, demonstrates that harm suffered during medical treatment of a compensable injury is considered a consequence of the original injury, as opposed to a new, separate injury.[4] Arctic Bowl does not directly contradict this proposition, but instead casts the injury as an ongoing or progressive injury, culminating in the July 19, 1988, surgery. This would make the July 19 surgery a part of the injury, specifically reflecting the final date of the injury, rather than a separate injury.

SIF does not claim that no SIF-compensable injury occurred, but instead argues that Arctic Bowl did not inform SIF within 100 weeks of discovering the injury. At some point in the spring or summer of 1988, De-Long, in the course of her employment, suffered a recurrence of her hernia. The corrective surgery caused further damage to DeLong's abdominal wall. It is uncontested that Arctic Bowl knew of the existence of that recurrence and of the surgery more than 100 weeks before it filed notice of a possible claim against SIF. Therefore, if simple knowledge that an injurious event has occurred is sufficient for the purpose of triggering the 100–week time period, then Arctic Bowl's claim is time-barred.

■ Thus, there is little relevance to the question of whether the July 19, 1988 surgery constitutes a part of an ongoing injury, or is simply a consequence of a workplace injury. The relevant question is whether the time limit for reporting a progressive or degenerative injury begins running from the moment of the employer's knowledge of the injury, or from the moment of the employer's knowledge that an injury rises to a potentially SIF-compensable level.

DeLong suffered a workplace injury in the spring or summer of 1988 which would not qualify for SIF reimbursement, but which later became aggravated to the point where it does qualify for such reimbursement. Though the aggravation is considered a compensable consequence of the original injury, it is not a new work-related injury.

Under SIF's proffered analysis, the 100–week period began to run from the time DeLong's hernia recurred, or at the latest from the time Arctic Bowl knew of the hernia recurrence. SIF argues that the hernia itself was the injury—and the postsurgical inflammation merely a consequence thereof—so that as soon as the employer knew of that injury, its time to notify SIF began—regardless of whether her injury, on that date, actually qualified under the SIF statute.

SIF contends that the term "injury" as used in AS 23.30.205(f) [5] is simply and entirely defined by AS 23.30.265(17),[6] which states:

ter v. Pub. Emp. Retirement Bd., 817 P.2d 472, 474 (Alaska 1991).

4. See, e.g., Sanders v. General Motors Corp., 137 Mich.App. 456, 358 N.W.2d 611 (1984); Lahue v. Missouri State Treasurer, 820 S.W.2d 561 (Mo. App.1991). Though harm caused by medical treatment for a compensable injury is not considered a separate work-related injury, it is compensable as a consequence of the original injury. 1 Arthur Larson, The Law of Workmen's Compensation Law § 13.21(a) (1993) ("It is now uniformly held that aggravation of the primary injury by medical or surgical treatment is compensable."). See also Ribar v. H & S Earthmovers, 618 P.2d 582, 584 (Alaska 1980) ("[T]he general rule is that the consequences of medical negligence committed while treating a compensable injury are themselves compensable.").

5. AS 23.30.205(f) provides:

An employer or the employer's carrier shall notify the commissioner of labor of any possible claim against the second injury fund as soon as practicable, but in no event later than 100 weeks after the employer or the employer's carrier have knowledge of the injury or death.

6. AS 23.30.265(17) provides:

"[I]njury" means accidental injury or death arising out of and in the course of employment, and an occupational disease or infection which arises naturally out of the employment or which naturally or unavoidably results from an accidental injury; "injury" includes breakage or damage to eyeglasses, hearing aids, dentures, or any prosthetic devices which function as part of the body and further includes an injury caused by the wilful act of a third person directed against an employee because of the employment; "injury" does not include mental injury caused by mental stress unless it is established that (A) the work stress was extraordinary and unusual in comparison to pressures and tensions experienced by individuals in a comparable work environment, and

" 'injury' means accidental injury or death arising out of and in the course of employment." SIF notes that "[t]here is nothing in the definition of 'injury' that provides that the term 'injury' for SIF purposes means 'when the combined effect test is met.'"

However, SIF's proposed reliance on AS 23.30.265(17) is much broader than is warranted. The "definition" provided in this section is not a true definition of "injury" at all—instead, it is a delimitation of injuries covered by the statute. A true definition does not use the word being defined to define itself. This section is only intended to make clear that the word "injury," when used in this chapter, refers only to those particular injuries which are work-related.[7] That is all this "definition" conveys; nothing more. What constitutes an injury in the first place is not addressed. Therefore, it is impossible to draw substantive legal conclusions about the basic meaning of the term "injury" from this description of the chapter's use of the word.

Since the statutory description is not decisive on this issue, the word "injury" as used in AS 23.30.205(f) must be understood in light of the common meaning of the word in the context of the statute.

The way "injury" is used in the SIF section clarifies its use in subsection (f). Subsection (f) provides that the notice may be no later than 100 weeks after the employer has knowledge of "*the* injury or death." The use of the definite article implies that the section has already addressed the issue of which injury or death. Subsection (a) confirms this by indicating which injuries are covered by this section:

> If an employee ... incurs a subsequent disability by *injury arising out of and in the course of the employment resulting in compensation liability for disability that is substantially greater by reason of the combined effects of the preexisting impairment and subsequent injury ... than that which would have resulted from the subsequent injury alone ....*

(Emphasis added.) Thus, "the" injury refers to an injury "arising out of and in the course of the employment resulting in compensation liability for disability that is substantially greater by reason of the combined effects...."

As the superior court stated in its December 16 Opinion and Order, "an 'injury' does not become an 'injury' for SIF purposes until the 'combined effects' test of AS 23.30.205(a) is met.[8] Injuries subsequent to the underlying impairment, but which do not result in a greater disability than existed before, do not give rise to a claim for SIF reimbursement." Since the "combined effects" test was not satisfied until July 19, 1988, the date of injury for SIF purposes can be no earlier. The mere knowledge that an injury has occurred does not suffice to trigger the 100-week notice period.[9]

Only after knowledge of the possibly SIF-compensable harm to the employee can the

---

(B) the work stress was the predominant cause of the mental injury; the amount of work stress shall be measured by actual events; a mental injury is not considered to arise out of and in the course of employment if it results from a disciplinary action, work evaluation, job transfer, layoff, demotion, termination, or similar action, taken in good faith by the employer[.]

**7.** Or, in other words, that this statute does not cover nonwork-related injuries.

**8.** In this regard the superior court said:

The court finds that the proper date for calculating the 100-week notice requirement is July 19, 1988, the date of surgery, but not necessarily for the same reasons articulated by the Board. Not all compensable injuries are "injuries" for purposes of reimbursement from

the SIF. For an injury to give rise to reimbursement from the SIF, the injury must combine with a previous permanent physical impairment creating a greater disability than would exist from the injury alone. *See* AS 23.30.205(a). In other words, an "injury" does not become an "injury" for SIF purposes until the "combined effects" test is met. Injuries subsequent to the underlying impairment, but which do not result in a greater disability than existed before, do not give rise to a claim for SIF reimbursement.

(Footnote omitted.)

**9.** In *Industrial Accident Board v. Parker*, 348 S.W.2d 188, 196 (Tex.Civ.App.1960), the court held that an employee's failure to timely notify the Board and make a claim on the Second Injury Fund would be excused until he became aware that his injuries met the combined effect test.

employer be expected to notify SIF. Otherwise the employer would be required to report every injurious event to SIF, even if that harm clearly failed to meet the "combined effects" test.

DeLong's injury became a possible claim against SIF when the "combined effects" test was satisfied. Though the hernia recurred earlier, the "combined effects" test was not satisfied until DeLong's abdominal wall suffered damage in the July 19, 1988, surgery. Since the SIF statute imposes a time limit on the notice of possible claim only from the time that the employer has knowledge of an injury which gives rise to a possible SIF claim, the date of Arctic Bowl's discovery of the inflammation and weakening of DeLong's abdominal wall is the starting point for the 100-week period.

■ SIF places Arctic Bowl's date of knowledge at August 30, 1989—more than 100 weeks before Arctic Bowl notified SIF of a possible claim. On August 30, 1989, Arctic Bowl's attorney, Glass, took DeLong's deposition. Glass is also a physician. SIF contends that because Glass is a physician, his deposition of DeLong informed him of the medical status of her abdominal wall.

SIF asserts that since Glass has medical training, he could not have failed to have learned of DeLong's medical condition when he conducted her deposition. It relies on a statement in Dr. Montano's affidavit that "[t]ypically, an adequate understanding of such mechanisms and response in the surgical patient is obtainable only with a medical education." Noting that Glass has a medical education, SIF concludes that having interviewed DeLong regarding medical issues, and having had access to at least some of her medical records, Glass could not have failed to learn of the "mechanisms and response" she underwent after surgery.

Arctic Bowl responds not that Glass was incapable of understanding the medical issues, but rather that he did not in fact learn of the particular response to surgery that DeLong had suffered. Unless this is an unreasonable interpretation of the events, we

are bound to accept the Board's findings of fact.

The Board's conclusion was not unreasonable. First, it is not the case that a non-treating physician always comes to a complete understanding of a person's medical condition from an interview with that person. In fact, in some cases the person may simply not know enough details for the physician to draw a reliable conclusion, thus making it impossible to reach an understanding of that person's medical condition from an interview. Glass had never examined DeLong's abdomen, nor had he ever talked to a doctor who had. It was not unreasonable to conclude that he lacked sufficient information to form an opinion as to the response of DeLong's abdominal tissue to surgery.

Furthermore, the deposition transcript indicates no awareness on Glass's part of a complex post-surgical response. Glass comments only on the effects of a recurrent hernia, not on the abdominal inflammation and weakening that may be caused by surgery. Arctic Bowl, through its attorney Glass, was made aware of the fact that DeLong had undergone surgery, but there is no suggestion that it was also made aware that DeLong had been somehow damaged by that surgery. Glass may have had the training to understand how surgery can affect the abdominal wall in certain cases, but there is no evidence in the record that makes unreasonable the Board's conclusion that Glass lacked the requisite information to deduce that surgery had affected DeLong's abdominal wall in this way.

If the August 30, 1989 deposition did not inform Arctic Bowl of the damage to DeLong's abdominal wall, Arctic Bowl could only have learned of the damage on July 31, 1991, when Dr. Montano met with an Arctic Bowl representative; on August 9, 1991, the date of Dr. Montano's affidavit regarding his medical opinion; or on August 30, 1991, the date Arctic Bowl says it received Dr. Montano's affidavit. All of these dates are well within 100 weeks of Arctic Bowl's September 5, 1991, notice to SIF.[10]

10. SIF points out that there was a long delay between the date of DeLong's surgery and the

date of Arctic Bowl's interview of Dr. Montano. SIF provides little argument and no law regard-

**B. Did Arctic Bowl Make at Least 104 Weeks of Payments on the Qualifying Second Injury?** [11]

■ The Board found that under the terms of the compromise and release (C & R) approved in December 1990 by DeLong and Arctic Bowl, Arctic Bowl made compensation payments toward the 1986 hernia, not the second injury, in 1988. The superior court, however, reversed this finding, holding that the C & R did include payment for the 1988 injury.

■ The C & R is ambiguous, and necessarily so. "The primary goal of contract interpretation is to give effect to the parties' reasonable expectations." *Aviation Assocs. v. TEMSCO Helicopters, Inc.*, 881 P.2d 1127, 1130 n. 4 (Alaska 1994). But the parties here could not have had any expectations regarding the harm caused to DeLong in July 1988, since they did not know of its existence at the time they entered the C & R. Therefore, an overly rigid reading of the terms of the C & R will be deceptive. The C & R does not explicitly refer to the July 1988 injury—nor could it have.

■ However, as the superior court noted, the C & R, after referring to the 1986 injury, states that DeLong

> may have sustained other recurrences of the preexisting ventral hernia during the time she was employed by the employer.... This Compromise and Release is intended to resolve any claims for any

injuries to or aggravations of employee's recurrent ventral hernia sustained by her during employment with the employer.

Furthermore, the C & R notes that "the employee's injuries and disability ... are or may be continuing and progressive in nature and ... the nature and extent of said injuries and resulting disability may not be fully known at this time." It goes on to state that the employer is released from "any known or as yet undiscovered disabilities, injuries or other damages associated with said accident."

Thus, though the parties obviously could not have had any specific expectations about payments for post-surgical inflammation and weakening of the abdominal wall, they did have a general expectation that some of the money paid under the C & R would cover possible undiscovered injuries.

Additionally, as the superior court noted, the C & R states that the employee had received vocational rehabilitation benefits and compromised any future benefits to which she might have been entitled. Since the 1986 injury did not rise to a level entitling her to vocational rehabilitation, the 1988 injury must provide the basis for this compensation. Moreover, DeLong received Temporary Total Disability payments from January 6 to March 5, 1987, and from July 18, 1988, to September 29, 1990 (over 114 weeks). The 1987 payments were for the 1986 injury, but the 1988–1990 payments stem from the 1988 injury. [12]

ing the effect of delay in investigation or discovery on the time limit for giving notice. Since SIF only cursorily argues this point, and since it is not included in the points on appeal, this argument is considered waived. *See Petersen v. Mutual Life Ins. Co.*, 803 P.2d 406, 410 (Alaska 1990); *Hootch v. Alaska State–Operated Sch. Sys.*, 536 P.2d 793, 808 n. 58 (Alaska 1975).

11. This issue revolves around the interpretation and legal effect of a compromise and release entered into by Arctic Bowl and DeLong. Interpretation of a contract is a question of law for which this court will use its independent judgment. *Alaska Energy Auth. v. Fairmont Ins. Co.*, 845 P.2d 420 (Alaska 1993).

    AS 23.30.205(a) provides:

If an employee who has a permanent physical impairment from any cause or origin incurs a subsequent disability by injury arising out of and in the course of the employment resulting

in compensation liability for disability that is substantially greater by reason of the combined effects of the preexisting impairment and subsequent injury or by reason of the aggravation of the preexisting impairment than that which would have resulted from the subsequent injury alone, the employer or the insurance carrier shall in the first instance pay all awards of compensation provided by this chapter, but the employer or the insurance carrier shall be reimbursed from the second injury fund for all compensation payments subsequent to those payable for the first 104 weeks of disability.

12. This does not contradict Arctic Bowl's claim that it lacked knowledge of DeLong's injury until August 1991. Arctic Bowl does not argue that it did not know DeLong was hurt, but rather that it did not know that she had suffered an SIF-eligible injury.

In short, the superior court correctly determined that the C & R provided for over 104 weeks of payments stemming from the SIF-eligible injury.

C. *Should the Superior Court Have Granted Attorney's Fees to Arctic Bowl?*

■ On cross-appeal, Arctic Bowl argues that the superior court should have awarded it attorney's fees against SIF in Arctic Bowl's appeal. SIF asserts that it should not be liable for attorney's fees upon having its refusal to pay an employer overturned.

SIF quotes *Providence Washington Insurance Co. v. Busby*, 721 P.2d 1151 (Alaska 1986), to support its assertion that attorney's fees cannot be awarded against it. SIF's reliance on *Providence* is misplaced. *Providence* dealt with whether SIF should reimburse an employer for the employer's fees incurred in litigating against an employee. Thus, the statement in *Providence* that the SIF was established as a "limited reimbursement scheme for disability payments only" referred only to the reimbursement function of the SIF. *Id.* at 1152. It had nothing to do with SIF's status with respect to its own litigation.

The statute under which Arctic Bowl is seeking attorney's fees, AS 23.30.145(c),[13] taken in conjunction with Appellate Rule 508(e),[14] can properly be construed to authorize an award of attorney's fees. SIF, as the losing appellee, is thus liable for partial fees.

D. *Can SIF be a Party to an Appeal?*

■ Arctic Bowl also contends that because of SIF's status in relation to the Board and the Department of Labor, SIF cannot take appeals from Board decisions. Arctic

Bowl's position is without merit. SIF is administered by the Commissioner of Labor, and is not merely an arm of the Board. Though SIF is bound to make payments in accordance with Board awards, AS 23.30.040(a),[15] this is no more than is required of any party properly before the Board, and has no bearing on the right to appeal.

## IV. CONCLUSION

The superior court's Opinion and Order of December 16, 1994 is AFFIRMED. The amount owed by SIF was stipulated by the parties and accepted by the Board and judgment was entered by the superior court. This April 14, 1995 judgment is AFFIRMED. The superior court's January 4, 1995 Order Denying Motion for Attorney's Fees is VACATED. The issue of attorney's fees is REMANDED for determination under AS 23.30.145(c) and Appellate Rule 508.

---

13. AS 23.30.145(c) reads as follows:
   If proceedings are had for review of a compensation or medical and related benefits order before a court, the court may allow or increase an attorney's fees. The fees are in addition to compensation or medical and related benefits ordered and shall be paid as the court may direct.

14. Appellate Rule 508(e), applicable to the superior court under Rule 601, provides that "[a]ttorney's fees may be allowed in an amount to be determined by the court."

15. AS 23.30.040(a) states:
   There is created a second injury fund, administered by the commissioner. Money in the second injury fund may only be paid for the benefit of those persons entitled to payment of benefits from the second injury fund under this chapter. Payments from the second injury fund must be made by the commissioner in accordance with the orders and awards of the board.