*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SALLYANNE M. BUTTS, f/k/a SALLYANNE M. DECASTRO, | ) ) ) | Supreme Court No. S-17283 |
| Appellant, | ) ) ) | Alaska Workers' Compensation Appeals Commission No. 17-023 |
| v. | ) ) | |
| STATE OF ALASKA, DEPARTMENT OF LABOR & WORKFORCE DEVELOPMENT, | ) ) ) ) | O P I N I O N<br><br>No. 7465 – July 10, 2020 |
| Appellee. | ) ) ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Andrew D. Wilson, Rehbock & Wilson, Anchorage, for Appellant. Lars B. Johnson and Kim S. Stone, Assistant Attorneys General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

BOLGER, Chief Justice.

## I.      INTRODUCTION

An office worker fell from her chair onto her hands and left knee. She initially suffered left knee symptoms and later developed right knee problems and lower

back pain that she alleged arose from the fall.  She argues that the Alaska Workers' Compensation Board erred when it performed its presumption analysis and when it awarded compensation for her left knee and back for only a limited period of time following the accident.  But we conclude that the Board appropriately considered the knee injuries and the back injury as distinct injuries and applied the presumption analysis accordingly; that the Board properly relied on the conflicting medical evidence to make its own legal decision about which of Butts's conditions were compensable; and that the Board was not required to award compensation for knee replacement surgeries performed five years after the accident.  We therefore affirm the Alaska Workers' Compensation Appeals Commission's decision affirming the Board.

## II.    FACTS AND PROCEEDINGS

Sallyanne Butts worked as an administrative assistant for the Department of Labor and Workforce Development in Kenai in 2011.  She was injured in March 2011 when she tried to get up from an ergonomic chair her supervisor had given her to use that morning.  She got the chair because the office chair she had been using "was kind of bothering [her] a little bit."  She said she knelt in the ergonomic chair, which had "pegs behind [her]" to "hook [her] feet . . . over top of," pads in the front for her knees, and a seat that was "almost like a bicycle seat."

Butts acted as a receptionist, and she fell when someone came into the office and she tried to get up to help them.  She said the chair tipped forward, flipped, and "kind of forced [her] to the ground."  She fell against a plastic runner on the floor, bracing her fall with her hands; her knee hit the plastic runner, her hand "jammed," and she "could feel it across [her] back."  She tried to complete the work day but left an hour or two early.  Butts said that night she mainly felt pain in her upper back, arm, and left hand, but her "left knee hurt some."  The day of the accident she went to a massage therapy appointment she had previously made for her back, used over the counter

medication, and returned to work the next day. She told her supervisor she wanted to "give it a couple of days and see what happens" before she decided whether to complete an injury report or to see a doctor.

The left knee did not improve and began to show a significant bruise, so Butts decided to consult a doctor. She had pain when walking and described hearing a "crunch" when she put weight on her knee, but she continued to work at that time. She first saw Dr. Henry Krull for knee pain on March 24, 2011. He examined her and ordered X-rays, which showed no obvious problem. Dr. Krull diagnosed a left knee contusion, did not restrict her work activities in any way, allowed her to engage in activities "as tolerated," and estimated she would be medically stable "in the next 6 weeks." At Butts's next appointment with Dr. Krull in May, she reported improvement, with decreased pain in her knee but "some upper back/shoulder pain." No work restrictions were imposed.

In July Butts reported worsening left knee pain, and Dr. Krull recommended physical therapy. The next month Butts again said the pain was worse, and Dr. Krull ordered an MRI. The August exam for the first time recorded "crepitus without pain" in the left knee.[1] The MRI showed degeneration in the menisci but not a definite tear as well as "full-thickness" cartilage loss in one area of the joint. Dr. Krull changed his diagnosis to a left knee bone contusion. He discussed possible arthroscopic surgery with Butts, and she elected to proceed with surgery.

Dr. Krull described Butts as having a "kissing lesion" when her left knee was in 90 degrees of flexion; he later testified that this meant there was an injury to the cartilage on both sides of the joint. Because the two parts did not touch when the knee

---

[1] "Crepitus" or "crepitation" is a "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together." *Crepitus*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2005).

was extended, Dr. Krull thought the cartilage damage had happened when the knee was bent. He testified that the cartilage damage he observed was consistent with the fall at work as the mechanism of damage. He described "a fairly focal injury to cartilage in her knee" to distinguish it from degenerative damage.

Dr. Krull performed arthroscopic surgery on Butts's left knee on August 31. Butts received temporary total disability (TTD) for a short time immediately after the surgery. In late October Butts reported that she did not feel she was progressing much; Dr. Krull described her as "progressing very slowly" and ordered continued physical therapy. He recorded "near-normal" range of motion in December. At some point in the fall of 2011, Dr. Krull took Butts off work entirely, and he began viscosupplementation[2] in early January 2012.

By late January Butts was feeling much better and was returned to "modified duty" at work. On May 10, 2012, Butts reported that she had "ongoing, mild pain," with increased function. Dr. Krull released her to work without restrictions and said she was medically stable as of that date. He said there was no permanent impairment from the injury, but he did note that "she ha[d] severe arthritic change in the medial compartment of her knee that may warrant joint replacement at some point in the future."

Butts returned to Dr. Krull in mid-August 2012 with pain in both knees. She told Dr. Krull that her right knee had begun to hurt "a lot" about two months prior to the appointment and the pain was increasing; she "attribute[d] the symptoms to

---

[2] Viscosupplementation involves "intra-articular injections of hyaluronic acid"; the hyaluronic acid "reduc[es] the friction of the joint." Francisco J. Estades-Rubio, et al., *Knee Viscosupplementation: Cost-Effectiveness Analysis between Stabilized Hyaluronic Acid in a Single Injection versus Five Injections of Standard Hyaluronic Acid*, INT'L J. MOLECULAR SCI., Mar. 17, 2017, at 1, 2, https://doi.org/10.3390/ijms1800658.

overuse" from her left knee condition. Dr. Krull treated the pain with viscosupplementation. He did not impose work restrictions at that time, but scheduled an MRI and planned further viscosupplementation.

The MRI report diagnosed a complex tear of the medial meniscus, a "[m]oderate sprain" of the medial collateral ligament, and degenerative changes in all compartments of the right knee, "most pronounced within the medial compartment." Dr. Krull recommended arthroscopic surgery for the meniscus tear, with possible microfracture surgery.[3] Dr. Krull thought the right knee complaints "appear[ed] to be at least partially related to her current [workers' compensation] claim." He performed arthroscopic surgery on the right knee in early October 2012 and treated the meniscus tear. The cartilage problem he had planned to treat with microfracture "was not a discrete lesion but appeared to be more representative of early arthrosis," so he was unable to perform the planned treatment. The State began to pay TTD as of the date of surgery.

At her first visit to Dr. Krull after right knee surgery, Butts reported decreased pain. She reported decreased pain again at a late November visit, and she was released to light duty work at that time. The light duty restriction was continued in January; by late February, however, Butts reported she was no longer improving, and mild swelling and tenderness were observed. Another MRI was scheduled, and that MRI indicated that the medial meniscus tear was back or had never completely resolved. Butts decided to have another arthroscopic surgery on her right knee, and a second right

---

[3] Microfracture is a surgical technique used to repair cartilage. NATIONAL INSTITUTES OF HEALTH, *Medline Plus*, Knee microfracture surgery, https://medlineplus.gov/ency/article/007255.htm (last visited Apr. 17, 2020). "A small pointed tool called an awl is used to make very small holes in the bone near the damaged cartilage." *Id.* The holes are called microfractures; they "release cells from [the] bone marrow that can build new cartilage to replace the damaged tissue." *Id.*

knee surgery was performed in April 2013. One month before surgery, Dr. Krull noted that Butts's "worsening arthritic changes . . . may preclude return to 100%."

Following the second right knee surgery Butts initially reported decreased pain and was referred to aquatic physical therapy. About six weeks later, Butts reported more pain; she was again treated with viscosupplementation and was taken off work. Butts received more viscosupplementation the following month, and the State paid TTD through November 2, 2013. Butts's employment with the State ended when she exhausted her Family and Medical Leave Act leave, but the exact date is unclear.

The State scheduled an employer's medical evaluation (EME) with Dr. Keith Holley, an orthopedic surgeon, in November 2013. Dr. Holley diagnosed a left knee contusion related to the work injury, but he thought Butts suffered from age-related osteoarthritis in both knees. In Dr. Holley's opinion Butts's knee condition was "solely due to advanced osteoarthritis, the substantial cause of which is exogenous obesity and age-related degenerative changes in the knee." Dr. Holley thought the work injury was the substantial cause of Butts's need for limited medical care immediately after the fall, but he thought her work-related injury should have resolved within two months. He did not think Butts needed further medical care for her work injury. The State stopped paying TTD based on Dr. Holley's opinion that Butts had reached medical stability with respect to the work injury.

Butts gave a copy of the EME report to Dr. Krull, who wrote a letter in response. Dr. Krull agreed with parts of the report: he agreed that (1) Butts's main problem was osteoarthritis; (2) she was obese; and (3) she "likely ha[d] some age-related degenerative changes." But Dr. Krull emphasized that Butts had no symptoms prior to her fall at work and had not previously been diagnosed with osteoarthritis. Dr. Krull wrote that Butts's "work injury is the significant contributor to her current state." At this point Butts's knee treatment became dormant because Dr. Krull recommended total knee

replacement and Butts thought it would be best if she tried to lose weight before proceeding with knee replacement surgery.

Beginning in 2014 Butts's back became the focus of her medical care. On the day of the injury Butts told her massage therapist she had been having low back pain for a "few weeks" and that the fall at work caused mid- and low-back pain. Butts later complained of pins-and-needles pain in her leg, which Dr. Krull thought might be related to back problems, so he referred her to Dr. Steven C. Humphreys for evaluation of her back in October 2013. An MRI showed spondylolisthesis[4] at L4-L5 and some disc bulging at several levels. Dr. Humphreys thought the back pain might be related to the knee injury because an abnormal gait could aggravate Butts's back condition. Dr. Humphreys referred Butts to a pain management doctor, but that treatment provided only minimal relief. Dr. Humphreys recommended that Butts have knee replacement surgery before considering back surgery. The State filed a controversion of all benefits related to Butts's low back in July 2014.

Butts filed a written workers' compensation claim in September 2015 seeking an unspecified period of TTD, permanent partial impairment (PPI), and unspecified medical benefits. She said both her knees and her low back were injured by the fall, and she set out a relatively detailed explanation of her injury theory. The State filed a controversion of all benefits the following month.

Butts had a total left knee replacement in May 2016, followed by a total right knee replacement in September 2016. Dr. Holley conducted a records review and in September wrote a second EME report; his conclusions did not change. The parties

---

⁴ Spondylolisthesis is "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum." *Spondylolisthesis*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2005).

stipulated to a second independent medical evaluation (SIME), and Dr. Robert Langen, an orthopedic surgeon, did the evaluation.

The SIME report agreed with Dr. Holley's assessment for the most part. Dr. Langen thought the March 2011 injury resulted in a contusion to Butts's left knee that resolved rather quickly, and he thought her other problems were caused by her obesity and age-related degenerative changes that preexisted the injury. He did not think the fall permanently aggravated her degenerative conditions. When asked to "evaluate the relative contribution of different causes," Dr. Langen wrote that with respect to her knees, her preexisting degenerative changes and her obesity were the causes of her knee pain. He thought her back pain was related to "a progression of previously existing conditions."

The Board held a hearing on Butts's claim in May 2017. Butts and Dr. Krull testified at the hearing, and the Board had the depositions of Dr. Holley, Dr. Krull, and Dr. Humphreys. Butts testified about the injury, the impact it had on her life, and her understanding of her diagnoses and medical care.

Dr. Krull's testimony sets out Butts's theory of compensability, so we provide a detailed summary of it. Dr. Krull testified that he changed his diagnosis of Butts's work-related injury from a contusion to something more serious after the left knee MRI showed she had an osteochondral defect, which he said was "an injury to the bone and cartilage surface." Dr. Krull said that "[a] traumatic injury to the cartilage would be the classic mechanism" of an osteochondral defect. He said that degeneration can also cause osteochondral defects, but osteochondral lesions like Butts's "typically describe . . . a focal type of cartilage injury." Because Butts had a kissing lesion when her knee was flexed to 90 degrees, Dr. Krull thought the most likely explanation for the cartilage damage was a traumatic injury that happened when Butts had her knee bent, which he thought was consistent with her falling on her knee at work.

Dr. Krull further testified that Butts's x-rays taken shortly after the accident showed no "significant radiographic arthritic changes" in her left knee. He indicated that "[p]lain x-rays are a better tool for assessing arthritis" and said her follow-up x-rays from November 2013 showed "very obvious signs of arthritis in the knee." Dr. Krull thought the trauma to Butts's left knee started an arthritic process that progressed rapidly because of her age and the injury mechanism. Dr. Krull acknowledged that osteoarthritis can have a "spontaneous onset" and said there was no "overwhelmingly popular answer as to what causes" a spontaneous onset. He also indicated Butts had predisposing factors that could have contributed to her knee pain.

With respect to the right knee, Dr. Krull said that during recovery from the left knee surgery, Butts likely put additional stress on her right knee. Dr. Krull thought the added stress on the right knee likely caused a meniscus tear that required the right knee arthroscopic surgery. He agreed that degenerative meniscus tears can happen spontaneously, but he said an injury was a more common cause. Dr. Krull testified that another possible cause of Butts's right knee meniscus tear was "degeneration and her obesity adding to that." Dr. Krull deferred to Dr. Humphreys with respect to the low back condition.

The Board's decision first considered what injuries Butts had suffered. The Board indicated that Butts "contend[ed] her work injury . . . caused compensable injuries to her left knee, right knee[,] and low back." The Board said the presumption of compensability applied to this question and found that Butts had attached the presumption through her own testimony and that of Drs. Krull and Humphreys. The Board moved to the second stage and decided the State had rebutted the presumption with the opinions of Drs. Holley and Langen that Butts's knee osteoarthritis and her low

back condition were the result of preexisting conditions that were not aggravated by the work-related fall.

At the third stage, the Board analyzed each alleged injury separately, beginning with the left knee. The Board decided Butts had shown that her fall at work was the substantial cause of her disability and need for medical treatment through May 10, 2012, the date Dr. Krull said she was medically stable after her left knee arthroscopic surgery. The Board gave more weight to Dr. Krull's opinion that the knee pain was related to work at least through the left knee arthroscopic surgery. The Board did not clearly adopt Dr. Krull's causation theory, saying with respect to his testimony about the kissing lesion that "[h]e did not need to go that far" because Butts needed to show that her work injury was the substantial cause only of her need for medical treatment, not of the underlying condition.

The Board said the "knee specialists" all agreed the arthroscopic surgery was reasonable and necessary treatment, even if they did not agree on causation. The Board said Butts had "proven her left knee work injury continued to arise out of and in the course of her employment and continued to be compensable through at least August 31, 2011," the date of the arthroscopic surgery on that knee. After briefly summarizing Butts's care through May 10, 2012, the Board noted Dr. Krull's statement about medical stability and his recommendation that Butts's " 'severe arthritic changes' in her left knee 'may warrant knee replacement at some point in the future.' "

The Board then considered that Butts had gone "over two months without any left knee treatment" when she returned to Dr. Krull's care in August 2012 complaining of pain in both knees. The Board decided that as of August 16, 2012, Dr. Holley's and Dr. Langen's opinions about causation were entitled to more weight. It therefore decided that after Dr. Krull's initial determination of medical stability in May 2012, Butts's left knee injury was not compensable.

Turning to the right knee, the Board observed that Butts had not fallen on her right knee and had mentioned it only once from March 2011 until August 2012. It determined that the "facts support ordinary degeneration as the substantial cause of subsequent right knee treatment." It gave more weight to Dr. Holley's and Dr. Langen's opinions and decided Butts had not proved by a preponderance of the evidence that her right knee condition was compensable.

With respect to Butts's low back condition, the Board observed that Butts was a recreational weight lifter and had complained in February 2011 about back pain from doing squats. The Board discussed Dr. Humphreys' opinion that Butts may have aggravated her spondylolisthesis through limping after her work injury as well as Dr. Holley's and Dr. Langen's opinions that her low back condition was degenerative. The Board noted periods of time when Butts had no back pain complaints, and it decided that the existence of "gaps" in her symptoms was "consistent with gradual degenerative progression relating to spondylolisthesis." The Board decided that any work-related aggravation of the spondylolisthesis was temporary and ceased being compensable at the same time her left knee condition reached medical stability.

After deciding what Butts's work-related injuries were, the Board considered the benefits she sought. It determined she was not eligible for additional TTD or medical benefits because the State had paid benefits through the date of medical stability for the injuries the Board decided were work-related. The Board said Butts could obtain a valid PPI rating for the left knee condition it had found compensable and seek modification as long as she met the standard for it.

Butts appealed to the Commission. She contended that the Board did not apply the presumption analysis "to each injury individually" and erred as a matter of law "in failing to order all treatment from an injury which it deemed compensable," as

required by AS 23.30.095. She argued the Board erred "by making findings of fact without medical opinions to support" them and by considering improper factors.

The Commission affirmed the Board's decision. The Commission first decided that there was only one work injury, "the fall from the ergonomic chair." It wrote that "the presumption analysis does not apply here to the question of whether there was a work injury, because all parties agree Ms. Butts fell out of her chair at work." The Commission thought the Board had properly applied the presumption analysis to issues of medical treatment, but the Commission went through its own presumption analysis. The Commission saw no legal error in the Board's analysis and decided that substantial evidence in the record supported the Board's decision. The Commission refused to consider Butts's constitutional challenge to the 2005 causation standard and rejected Butts's arguments that the Board had incorrectly considered prohibited factors when comparing causes to reach its conclusion about compensability. Butts appeals.

## III. STANDARD OF REVIEW

In a workers' compensation appeal from the Commission, we review the Commission's decision.[5] We use our independent judgment to decide questions of law that do not involve agency expertise.[6] We independently evaluate the Commission's conclusion that substantial evidence supports the Board's decision, which "necessarily requires us to independently review the record and the Board's factual findings."[7]

## IV. DISCUSSION

### A. The Board Correctly Identified Butts's Injuries.

A central issue in this case is the compensability of what Butts contends are

---

[5]     *Burke v. Raven Elec., Inc.*, 420 P.3d 1196, 1202 (Alaska 2018).

[6]     *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

[7]     *Id.*

three separate injuries to different body parts. We first set out statutory provisions relevant to her arguments.

An "injury" in the Act is an "accidental injury . . . arising out of and in the course of employment, and an occupational disease . . . that arises naturally out of the employment or that naturally or unavoidably results from an accidental injury."[8] The Act requires an employer to "furnish medical, surgical, and other . . . treatment . . . for the period which the nature of the injury or the process of recovery requires."[9] Under AS 23.30.120(a)(1), in a workers' compensation proceeding "it is presumed, in the absence of substantial evidence to the contrary, that the claim comes within the provisions of [the Act]." Alaska Statute 23.30.010(a) provides in pertinent part:

> [C]ompensation or benefits are payable under this chapter for disability . . . or the need for medical treatment of an employee if the disability . . . or the employee's need for medical treatment arose out of and in the course of the employment. To establish a presumption under AS 23.30.120(a)(1) that the disability . . . or the need for medical treatment arose out of and in the course of the employment, the employee must establish a causal link between the employment and the disability . . . or the need for medical treatment. . . . When determining whether . . . the . . . disability or the need for medical treatment arose out of and in the course of the employment, the board must evaluate the relative contribution of different causes of the disability . . . or the need for medical treatment. Compensation or benefits under this chapter are payable for the disability . . . or need for medical treatment if, in relation to other causes, the employment is the substantial cause of the disability . . . or need for medical treatment.

---

[8]     AS 23.30.395(24).

[9]     AS 23.30.095(a).

We have previously observed that the definition of "injury" in the Act "is not a true definition" but "is a delimitation of injuries covered by the statute."[10] The parties agree that under our precedent, a work-related accident can give rise to multiple injuries as that term is used in the Act.[11] But they dispute the number of injuries Butts suffered and whether the agencies properly identified the injuries.

Butts argues that (1) she had three distinct injuries as that term is defined in AS 23.30.395(24); (2) she was entitled to a presumption analysis with respect to each injury; and (3) neither the Board nor the Commission properly applied the presumption analysis to the "injury" question. The State maintains the Commission correctly decided that the fall at work was the only injury, asserting that what Butts calls "injuries" are not separate injuries but are "symptoms caused by the workplace injury." The State contends the agencies both properly analyzed Butts's claim.

Butts presented the following injury theory to the Board: her "initial injury was a kissing lesion in her left knee," followed by her "right knee meniscal tears and her bilateral symptomatic osteoarthritis."[12] Dr. Krull laid out this injury theory in a letter to Butts's attorney and in testimony before the Board. He testified that the fall caused cartilage damage in the left knee — the kissing lesion — which led to a dramatic worsening of any preexisting osteoarthritis in that knee, which in turn caused the need

---

[10] *Second Injury Fund v. Arctic Bowl*, 928 P.2d 590, 594 (Alaska 1996).

[11] *See, e.g.*, *Alaska Pac. Assurance Co. v. Turner*, 611 P.2d 12, 15 (Alaska 1980) (reversing Board decision that back injury was not compensable when it arose out of earlier work-related accident); *Cook v. Alaska Workmen's Comp. Bd.*, 476 P.2d 29, 35 (Alaska 1970) (holding that a later injury can be compensable if an earlier compensable injury is a substantial factor contributing to the later injury).

[12] Before the Board Butts argued she had a compensable low back condition due to changes in her gait that stemmed from knee pain. Her brief before us does not discuss the compensability of the back injury, so we do not discuss it.

for a left knee replacement. With respect to the right knee, Dr. Krull indicated that Butts "favor[ed]" the left knee after she fell, which put additional stress on the right knee and led to the meniscus tear that ultimately caused Butts's dramatically worsened osteoarthritis and need for a right knee replacement surgery. The State's theory, in contrast, was that Butts's sole injury was a contusion to her left knee that resolved in about two months.

The Commission identified the fall as the injury and wrote that the presumption did not apply to the injury question "because all parties agree Ms. Butts fell out of her chair at work." The Commission's decision and the State's argument here merge two related but distinct concepts: an accident and an injury. Injury is damage or harm;[13] "accidental injury," one term used in AS 23.30.395(24), is "[a]n injury resulting from external, violent, and unanticipated causes."[14] That an accident can happen without an injury is illustrated by a sample phrase in the definition of "injury": "escaped from the accident without injury."[15]

Butts's arguments, on the other hand, merge two other distinct but related concepts in workers' compensation: injury and medical treatment. She asserts that after deciding her left knee condition was initially compensable, "the Board did not address whether the presumption was then raised for her subsequent left and right knee replacement surgeries." But surgeries are not injuries; they are medical care. Medical

---

[13]     *Injury*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://ahdictionary.com/word/search.html?q=injury (last visited Apr. 14, 2020).

[14]     *Accidental Injury*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[15]     *Injury*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://ahdictionary.com/word/search.html?q=injury (last visited Apr. 14, 2020).

care is only compensable if the injury itself is compensable.[16] If the Board decides an injury is not compensable, the Board does not need to apply the presumption analysis to determine whether medical treatment for that injury is compensable.

The parties agree, as the Commission noted, that Butts suffered a workplace fall; this was the underlying, work-related accident. But the parties disagreed about what injuries resulted from the accident. The State contended the accident caused only a contusion that resolved shortly afterward. Butts, in contrast, argued that the accident caused an initial injury of a kissing lesion in her left knee followed by several related but distinct conditions that "naturally or unavoidably result[ed] from [this] accidental injury."[17]

Even if the Commission misunderstood Butts's arguments, the Board recognized the injury theory Butts proposed, and it appropriately considered the injuries separately when it analyzed the evidence. Indeed, a majority of the Board's legal analysis is devoted to the issue it identified as "What are Employee's compensable injuries?" The Board considered Butts's claims for specific benefits only after it identified her compensable injuries.

The Board consolidated its discussion of attaching and rebutting the presumption of all of the injuries, but it is evident that the Board considered each "injury" separately even in this part of its decision because it wrote that Butts had attached the presumption "with her testimony, and medical opinions from Drs. Krull and Humphreys." These two doctors' treatment did not overlap: Dr. Krull treated Butts's knees, not her back, and Dr. Humphreys treated her back, not her knees. And at the third stage of the analysis, the Board provided a detailed discussion of each alleged injury, the

---

[16]     AS 23.30.095(a).

[17]     AS 23.30.395(24).

evidence it found relevant to the work-relatedness of that injury, and the weight it assigned to that evidence. The Board did not identify precisely what Butts's injury to her left knee was, mentioning her "difficulties," "symptoms," "pain," and "issues." Given the parties' agreement that the work-related accident caused some injury, we cannot say this was erroneous. We therefore conclude that the Board appropriately considered the knee injuries and the back injury as distinct injuries and used the presumption analysis individually for each alleged injury.

> **B.** **The Commission Correctly Concluded That The State Rebutted The Presumption.**

Butts argues that the Commission erred in concluding that the State rebutted the presumption. She summarizes the legal tests for rebutting the presumption and claims the State did not meet them because neither Dr. Holley's nor Dr. Langen's opinion addressed Dr. Krull's theory that the fall caused a kissing lesion, a theory which she claims the Board adopted. The State responds that Dr. Holley's and Dr. Langen's opinions only needed to provide an alternative explanation for Butts's continuing knee complaints that excluded work; it maintains that the opinions did so by positing that Butts's preexisting arthritis was the cause of all her ongoing complaints after the left knee contusion resolved.

The Board, when considering which of Butts's injuries were work related, decided Dr. Holley's and Dr. Langen's opinions that (1) the only work-related injury Butts suffered was a left knee contusion and (2) Butts's other knee complaints were caused by preexisting arthritic changes were adequate to rebut the presumption for all of Butts's alleged injuries. The Commission affirmed the Board's decision. We agree with the Commission that the State provided sufficient evidence to rebut the presumption.

Butts's argument before us fails to recognize that at the first two stages of the presumption analysis, the evidence is considered in isolation and is not weighed.[18] Because the evidence at the second stage is viewed in isolation, the Board could not compare Dr. Holley's and Dr. Langen's causation analysis to that of Dr. Krull. It is therefore immaterial whether the alternative explanation in Dr. Holley's and Dr. Langen's reports addressed Dr. Krull's theory of the kissing lesion because at the second stage there would be no indication the Board would give Dr. Krull's opinion any weight. To rebut the presumption the employer needs to show the Board that it has sufficient evidence to raise a factual issue about the work-relatedness of the injury, making a hearing on the claim necessary.[19] Dr. Holley's and Dr. Langen's opinions provided an alternative explanation that, if believed, would lead to the conclusion that Butts's continuing knee complaints had a cause unrelated to the work accident.[20] The doctors identified the same cause — preexisting degenerative changes — as the cause of *all* of Butts's conditions except the initial left knee contusion. Viewed in isolation, without weighing these opinions, they were sufficient to rebut the presumption that Butts suffered any work-related injury beyond the left knee contusion.

---

[18]    *McGahuey v. Whitestone Logging, Inc.*, 262 P.3d 613, 620 (Alaska 2011).

[19]    We have not determined how (if at all) the 2005 amendments changed the rebuttal stage of the presumption analysis when there is a preexisting condition. *See Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 919 (Alaska 2016). We do not need to decide that question here because the doctors' opinions rebutted the presumption under the pre-2005 standard. *See id.* at 917 (summarizing pre-2005 presumption analysis).

[20]    *Cf. McGahuey*, 262 P.3d at 620 (setting out rebuttal standards).

C. **The Commission Correctly Concluded That Substantial Evidence In The Record Supported The Board's Decision.**

1. **The Board acted within its authority in weighing the medical evidence.**

Butts contends that the Board's decision is not supported by substantial evidence. A prominent part of Butts's argument here is that the Board must accept in its entirety either of two conflicting causation theories presented to it, and, based on our precedent about unrebutted medical testimony, cannot "create[] its own medical opinion" when deciding a claim's compensability. Butts asserts that the Board adopted Dr. Krull's opinion that the fall caused a kissing lesion. She reasons that the Board was then required to adopt the entirety of Dr. Krull's causation theory as to all of her alleged injuries; in her view the Board erred because its analysis combined parts of Dr. Krull's opinions and "the incompatible conclusion[s]" of Drs. Holley and Langen, thereby inventing its own medical opinion.

The State answers that the Board fulfilled its role as the fact finder when it assigned weight to the different medical opinions and distinguishes the cases Butts relies on. Noting that the Board's findings "are subject to the same standard of review as a jury's finding in a civil action,"[21] the State analogizes the Board's evaluation of the medical testimony here to that permitted by a civil jury instruction, which informs jurors they "may believe all, part, or none of the testimony of an expert witness."[22]

---

[21]   AS 23.30.122.

[22]   *Marsingill v. O'Malley*, 128 P.3d 151, 160 n.48 (Alaska 2006) (quoting Alaska Civil Pattern Jury Instruction 2.10 (rev. 1999)).

At the third stage of the presumption analysis, the Board weighs the evidence to determine whether a claim is compensable.[23]  Under the new causation standard, the Board is required to consider all possible causes of the disability or need for medical care and decide which among the factors identified is the most important.[24] Here, the Board conducted a detailed, individualized inquiry about each body part Butts allegedly injured to evaluate Butts's claim that she suffered a work-related injury to that body part.

As a factual matter, Butts misreads the Board's decision:  the Board did not adopt Dr. Krull's opinion that the fall caused the kissing lesion.  The Board mentioned Butts's "difficulties," "symptoms," and "pain," but it never decided Butts suffered a kissing lesion from the fall.  The Board noted Dr. Krull's opinion about the kissing lesion, but it said Dr. Krull "did not have to go that far, as the work injury only had to be the substantial cause of the 'need for medical treatment,' not the substantial cause of the underlying condition itself."  While the Board did not make an exact finding about the extent of Butts's initial injury to her left knee, all doctors agreed she had suffered some work-related injury and that the treatment Dr. Krull provided was reasonable and necessary, even if Drs. Holley and Langen did not think the treatment was related to the work injury.  The Board simply decided that Dr. Krull's opinions about Butts's knee condition through the time he initially declared her to be medically stable were the most persuasive for that period of time.

Butts acknowledges that we have written, "When medical experts disagree about the cause of an employee's injury, we have held that as a general rule 'it is

---

[23]     *McGahuey*, 262 P.3d at 621.

[24]     *Morrison v. Alaska Interstate Constr. Inc.*, 440 P.3d 224, 237-39 (Alaska 2019).

undeniably the province of the Board and not this court to decide who to believe and who to distrust.' "[25] Nothing distinguishes her case from cases where the Board weighed conflicting medical testimony about causation. We agree with the State that none of the cases Butts cites supports her argument. Those cases concern the Board's rejection of an employee's medical evidence when the employer had presented no medical evidence in opposition,[26] findings that were unsupported by any medical opinion,[27] or the Board's failure to apply the presumption of compensability correctly.[28] Here the State provided a medical opinion that rebutted the presumption. No case Butts cites held that the Board is limited in its interpretation of conflicting medical evidence. The Board cited specific medical opinions to support each of its material findings, and it correctly applied the presumption analysis.

Butts characterizes the medical evidence as showing two diametrically opposed causation theories, but in fact Dr. Krull agreed with several of Dr. Holley's

---

[25]    *AT & T Alascom v. Orchitt*, 161 P.3d 1232, 1243 (Alaska 2007) (quoting *Bradbury v. Chugach Elec. Ass'n*, 71 P.3d 901, 909 (Alaska 2003)).

[26]    *Wade v. Anchorage Sch. Dist.*, 741 P.2d 634 (Alaska 1987) (holding that mental injury claim was compensable when employer offered no medical evidence to rebut presumption), *overruled by statute as recognized in Kelly v. State, Dep't of Corr.*, 218 P.3d 291, 298 (Alaska 2009); *Kessick v. Alyeska Pipeline Serv. Co.*, 617 P.2d 755, 758 (Alaska 1980) (holding that injury was compensable when employer offered no medical evidence contrary to employee's doctor).

[27]    *Rogers Elec. Co. v. Kouba*, 603 P.2d 909, 911-12 (Alaska 1979) (holding that Board's finding was not supported by testimony of either doctor who testified).

[28]    *Alaska Pac. Assurance Co. v. Turner*, 611 P.2d 12, 14 (Alaska 1980) (holding that the record had "no substantial evidence" that injury was not compensable); *Fireman's Fund Am. Ins. Cos. v. Gomes*, 544 P.2d 1013, 1016 (Alaska 1976) (holding that in absence of substantial evidence that death was not work related, employee's murder at work was compensable death).

opinions.  He agreed, for example, that obesity and age-related degenerative changes were "contributing factors" to Butts's overall condition.  He also agreed that osteoarthritis can become symptomatic spontaneously and that meniscus tears can be degenerative.  The causation analysis Dr. Krull set out at the hearing did not account for his May 2012 opinion, which the Board apparently found persuasive, that Butts had reached medical stability and had no permanent impairment related to her fall at work.

The Board did not create a medical opinion, as Butts contends.  The Board relied on specific medical evidence to craft its *legal* decision about which of Butts's conditions were compensable.  This is consonant with the Board's assigned role in the workers' compensation system:  under AS 23.30.122 the Board is the finder of fact whose duty it is to hear and weigh evidence, make findings based on that evidence, and apply the law to those findings.  The Board did precisely what it was required to do here, and substantial evidence supports its decision.

### 2. The Board was not legally required to order additional medical care.

Butts argues that AS 23.30.095(a) and *Phillip Weidner & Associates, Inc. v. Hibdon*[29] required the Board to order the State to pay for her two knee replacement surgeries as a matter of law.  The foundation of her argument is the Board's decision to find her left knee arthroscopic surgery compensable.  She characterizes the remaining treatment for both her knees as a continuing course of care, and she maintains that the entirety of the treatment was therefore compensable as a matter of law because it was all treatment that "the nature of the injury or process of recovery require[d]."[30]  And because Dr. Krull noted on May 10, 2012, that her "severe arthritic change in the medial

---

[29]     989 P.2d 727 (Alaska 1999).

[30]     AS 23.30.095(a).

compartment . . . may warrant joint replacement at some point in the future," she contends that her left knee replacement surgery comes within the "more stringent benefit requirements"[31] for treatment within the first two years following an injury.

The State argues that AS 23.30.095(a) does not apply because it had controverted Butts's claim. According to the State, "[w]here an employer has controverted benefits, AS 23.30.095(a) does not apply because it only sets a standard for appropriate care when employers do not dispute that an employee's need for care is work related."

Neither party's argument is correct. Alaska Statute 23.30.095(a) provides:

> The employer shall furnish medical, surgical, and other . . . treatment . . . for the period which the nature of the injury or the process of recovery requires, not exceeding two years from and after the date of injury to the employee. . . . It shall be additionally provided that, if continued treatment or care or both beyond the two-year period is indicated, the injured employee has the right of review by the board. The board may authorize continued treatment or care or both as the process of recovery may require.

This statutory subsection sets out an employer's substantive obligations under the Act; those obligations are unaffected by a controversion. A controversion is a procedural mechanism that an employer uses to tell the Board and an injured worker that it contests the compensability of a benefit.[32] The worker can then file a claim if she wishes to obtain Board review, and the Board can determine compensability of medical care by applying AS 23.30.095(a).

---

[31]     *Hibdon*, 989 P.2d at 731.

[32]     AS 23.30.155; *see Harris v. M-K Rivers*, 325 P.3d 510, 518 (Alaska 2014) (describing purpose of controversion).

In *Hibdon* we interpreted AS 23.30.095(a) as limiting the Board's discretion to direct an employee's choice of medical care within the first two years following an injury.[33]  We did not deem the employer's controversion of proposed care determinative of the employee's rights in *Hibdon*; in fact, we said, "It would be unjust to allow an employer to avoid the more stringent benefit requirements owed to injured employees in the first two years following an injury by simply controverting a claim and delaying the employee's medical treatment beyond the two years."[34]  In *Hibdon* we considered the date the employee was ready to undergo the treatment and the date the written claim for medical care was filed when we discussed application of the two-year limit in AS 23.30.095(a).[35]

With respect to Butts's arguments, neither the statute nor *Hibdon* permits a claimant to transform a prediction, made within the first two years after an injury, that a worker may need a joint replacement at an undetermined future time into an immediate claim for medical care.  In *Hibdon* the claimant's doctor "was prepared to proceed" with surgery one year and eight months after a compensable injury, but the doctor would not schedule the surgery at that time because the employer's compensation carrier would not authorize it.[36]  After the employer controverted the surgery, the employee filed, one year and ten months after the accidental injury, a written claim.[37]  We considered the date the claimant filed her written claim for surgery to be the important date for purposes of

---

[33]    989 P.2d at 731.

[34]    *Id.*

[35]    *Id.* at 730-31.

[36]    *Id.*

[37]    *Id.* at 730.

applying the statute, even though by the time we heard the case over five years had elapsed since the accident.[38]

Butts's case is plainly different from the facts of *Hibdon*. No doctor was ready to proceed with knee replacement surgery by March 2013, two years after Butts's fall; indeed Butts had not yet undergone the second right knee arthroscopic surgery by then. And the State did not controvert medical care in the first two years after the accident. Butts's written claim was filed in September 2015, more than four years after the accident. Nothing in *Hibdon* compels a legal result different from the Commission's decision.

Butts's remaining arguments related to AS 23.30.095 are not persuasive because the Board determined that the injuries the medical care was intended to treat were not compensable. The Board considered her claim that her right knee condition was an "injury" as defined in AS 23.30.395(24) and rejected that claim because it gave more weight to Dr. Holley's opinion that the condition was caused by age-related degenerative changes and obesity. The same is true for her left knee complaints after May 10, 2012, the date Dr. Krull initially determined she was medically stable from the effects of the injury: the Board decided her left knee condition, including the worsening osteoarthritis, was not compensable after that date because her preexisting degenerative changes were a more important cause of her knee condition than her work-related accidental injury. If the conditions requiring treatment were not compensable injuries, the State had no obligation under AS 23.30.095(a) to furnish medical care to treat them.

**D.    Butts Waived Her Constitutional Claims.**

Butts argued before the Commission, and argues here, that as applied to her, the causation standard adopted in 2005 violates her right to equal protection under both

---

[38]    *Id.* at 731, 733.

the United States Constitution and the Alaska Constitution.  We decline to consider these arguments because they are inadequately briefed.

Butts summarizes cases and principles related to state and federal equal protection analysis, but she does not explain how those principles apply to her case.  She does not, for example, identify the governmental purpose of AS 23.30.010(a),[39] nor does she identify the groups she claims are similarly situated but treated disparately.[40]  Points on appeal that are inadequately briefed are considered waived.[41]  Because we cannot discern the legal theory Butts advances to support her constitutional claims, we do not address them.

## V.    CONCLUSION

We AFFIRM the Commission's decision.

---

[39]    *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 55 (1973) (setting out rational-basis standard under federal equal protection analysis, including identification of a legitimate state purpose).

[40]    *See Glover v. State, Dep't of Transp., Alaska Marine Highway Sys.*, 175 P.3d 1240, 1257 (Alaska 2008) (observing that threshold requirement in Alaska equal protection challenge is existence of classification that treats similarly situated people disparately).

[41]    *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062 (Alaska 2005).